**AKRON CENTER FOR REPRODUCTIVE HEALTH, INC. et al., Plaintiffs,**

v.

**CITY OF AKRON et al., Defendants.**

Civ. A. No. C78–155A.

United States District Court,
N. D. Ohio, E. D.

Aug. 22, 1979.
On Motion for New Trial Oct. 4, 1979.

Stephan A. Landsman, Cleveland, Ohio, Dennis Haines, Patricia S. Roberts, Youngstown, Ohio, Wayne G. Hawley, Gordon J. Beggs, American Civil Liberties Union of Cleveland, Inc., Cleveland, Ohio, Janet L. Benshoof, American Civil Liberties Union, Reproductive Freedom Project, New York City, Robert P. App, American Civil Liberties Union of Ohio Foundation, Inc., Columbus, Ohio, Patricia A. Vance, Akron, Ohio, for plaintiffs.

Jane E. Bond, Akron, Ohio, for amici curiae.

James L. Bickett, Akron Law Dept., David G. Umbaugh, Akron, Ohio, Robert A. Destro, Milwaukee, Wis., James Bopp, Jr., Indianapolis, Ind., Alan G. Segedy, Akron, Ohio, for defendants.

MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

On February 28, 1978, the city council of Akron, Ohio, by a seven to six vote, passed Ordinance Number 160–1978, "amending and supplementing the Codified Ordinances of the City of Akron, Ohio, 1975, by the amendment of Chapter 1870, entitled 'Regulation of Abortions.'"[1] The ordinance represents an attempt to regulate the provision of abortions within the city of Akron without violating the constitutional right of a woman, in consultation with her physician, to choose to terminate her pregnancy. *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The problem presently before the Court is the determination of whether Akron has accomplished that goal.

This Court is, of course, aware of the national controversy which has resulted from the Supreme Court's decisions in *Roe* and *Doe.* Analytically, however, this case is no different than the numerous others that come before the Court. It is the duty of this Court to determine the controversy before it based upon the requirements of the Constitution as expounded by the Supreme Court and the Court of Appeals for the

---

1. The ordinance actually became law ten days later upon the mayor's failure to either sign or veto it. The full text of Ordinance 160–1978 is reprinted as the Appendix to this Opinion.

Sixth Circuit.[2] In considering the present case, this Court has attempted to do just that, nothing more and nothing less.

## I.

Ordinance Number 160–1978 provides extensive regulations of the provision of abortions. It also provides criminal sanctions for violation of its requirements. Section 3 of the ordinance established an effective date of May 1, 1978.

On April 19, 1978, the present action challenging the ordinance was instituted. The Court granted plaintiffs' motion for a temporary restraining order "enjoining defendants and any of their employees, agents and servants from attempting to enforce Ordinance No. 160–1978. . . ." Subsequently, defendants consented to entry of a preliminary injunction pending the Court's decision on the merits.

The Court duly heard testimony and received exhibits. The following shall constitute findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

## II.

The defendants in this action are the City of Akron, its Mayor, its Director of Public Health, and its Police Prosecutor. Plaintiffs are three Ohio corporations that operate out-patient abortion clinics within Akron and a physician who has performed abortions at one of those clinics.

On April 26, 1978, Doctor Francois Seguin and Patricia K. Black petitioned the Court for leave to intervene as defendants in a number of different capacities. The Court granted such leave to the extent of permitting petitioners' participation "solely in their individual capacity as parents of un-married minor daughters of childbearing age. . . . "

## A.

At the present time, the clinics operated by the corporate plaintiffs provide abortions only during the first trimester of pregnancy. The clinic coordinator of Akron Women's Clinic, however, indicated that if it were possible, that clinic would provide abortions during the early part of the second trimester of pregnancy. The reason that it is not now possible to provide abortions during the second trimester in a clinic setting is that Akron has had an ordinance requiring the performance of second trimester abortions in a hospital since some time prior to 1978. That ordinance is not now under attack.

The patients for whom the clinics provide their services range in age from about twelve years to approximately forty-five years. Two of the clinics provide abortions on three days a week (Wednesday, Friday, and Saturday) and the third provides abortions two days a week (Wednesday and Saturday).

Patients usually make their first contact with one of the clinics over the telephone. If a woman telephones and indicates that she desires an abortion and that her pregnancy has not progressed beyond the end of the first trimester, she will be given an appointment for one of the "procedure days." When the patient arrives at the clinic on the day of her appointment she is asked certain questions about her medical history and her pregnancy. She also participates in a group counseling session with counselors employed by the respective clinics. These counselors have varying degrees of qualifications, none, however, is a physi-

---

**2.** Mr. Justice Frankfurter, speaking in dissent to the Court's Opinion in *Board of Education v. Burnette,* 319 U.S. 624, 647, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting), stated:

As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard. The duty of a judge who must decide which of two claims before the Court shall prevail, that of a State to enact and enforce laws within its general competence or that of an individual to refuse obedience because of the demands of his conscience, is not that of the ordinary person. It can never be emphasized too much that one's own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one's duty on the bench.

cian. During the group counseling session, the patients are given information concerning the procedure to be performed upon them, information on birth control techniques, and after-care instructions. At some time near the close of her group counseling session, each patient is asked to sign a document acknowledging her informed consent to the performance of an abortion.

A patient's first contact with the physician who is to perform the abortion procedure usually occurs when she is taken into the operating room. At that time, the physician reviews the patient's medical chart and asks the patient if she has any questions. The doctor then performs a pelvic examination. If the pelvic examination does not reveal any medical problems and, further, indicates that the pregnancy has not progressed beyond the first trimester, the abortion usually will then be performed. There was some evidence that if the physician sensed that the patient was ambivalent concerning her decision, he would suggest that she return at another time after she had had some additional time to consider alternatives to abortion.

The abortion method used at the clinics is dilation and suction curettage (D&C). The procedure itself takes approximately five minutes.

## B.

The physician plaintiff is a resident of Cincinnati and primarily is engaged in the practice of medicine in that city. He has been licensed as a physician by the state of Ohio since 1957. He testified that his specialty is "Family Planning, which is really a subspecialty of Family Practice." As part of his practice, the physician plaintiff regularly performs abortions in Cincinnati.

Prior to the time the original complaint was filed in this action, the physician plaintiff had never performed abortions within Akron.[3] At some time prior to July 11, 1978, however, he received a telephone call from the clinic coordinator of Akron Wom-

en's Clinic. The coordinator proposed an arrangement whereby the physician plaintiff would occasionally substitute for her clinic's physicians when they were away from Akron or assist them during particularly busy times and they would, in return, do the same for him at his clinic in Cincinnati. She offered to pay his expenses to and from Akron plus a per procedure fee. The coordinator also inquired whether he would be interested in being a party to this action.

The physician plaintiff had been interested in finding a doctor who desired to enter into such a reciprocal arrangement for some time. He was, therefore, receptive to the coordinator's proposal. The opportunity to earn some additional income was also a factor that entered into his consideration. Finally, he concluded that he did want to participate in this action and felt that to do so it would be necessary for him to perform abortions in Akron.

The physician plaintiff first performed abortions in Akron on July 11, 1978. Between that date and the commencement of trial in this action, he performed abortions in Akron on one other occasion. At the time of trial, he anticipated performing abortions in Akron again during February of 1979 and thereafter as requested by Akron Women's Clinic's coordinator.

## III.

The plaintiffs have challenged Ordinance Number 160–1978 on a number of different grounds. Some of their claims are addressed to the ordinance in its entirety and others are addressed to specific sections of the ordinance. Some of their claims are that the ordinance, or parts thereof, is invalid because it interferes with their constitutional rights as operators of clinics providing abortions within Akron and as a physician providing abortions within Akron; others are that the ordinance, or parts thereof, interferes with their provision of

---

**3.** The physician plaintiff became a party to this action with the filing of the fourth amended complaint on July 28, 1978.

services to their patients in such a way as to infringe upon constitutional rights of those patients. Before proceeding to consideration of plaintiffs' numerous and varied claims, the Court deems it necessary to consider plaintiffs' standing. The discussion of plaintiffs standing consists of four areas: First, the Court will address an issue concerning the physician plaintiff's standing to raise any claims in this action; second, the Court will discuss general standards to be applied in determining plaintiffs' standing; third, the Court will determine if plaintiffs have standing to litigate the constitutionality of specific sections of the ordinance; finally, the Court will determine if plaintiffs have standing to litigate the constitutionality of the ordinance as a whole.

### A.

As found above, a consideration that entered into the physician plaintiff's decision to begin providing abortions within Akron was his desire to be a plaintiff in this action. This fact raises the question of whether such a desire to "test" Akron's ordinance should disqualify the physician plaintiff from doing so, assuming that he otherwise has standing.

■ Initially, the Court notes that the physician plaintiff presented evidence that in addition to performing abortions in Akron prior to trial of this action, he fully intended to continue to do so at certain times in the future. Defendants presented no conflicting evidence on this question. Even though only injunctive relief is sought, therefore, the physician plaintiff's claims are not moot. *See Meyers v. Pennypack Woods Home Ownership Association,* 559 F.2d 894, 898 n.5 (3rd Cir. 1977).

■ Further, it is clear that even if the physician plaintiff's sole motivation for commencing to perform abortions within Akron had been his desire to participate in the present action, such motivation would not detract from his standing in this case. *Pierson v. Ray,* 386 U.S. 547, 558, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Evers v. Dwyer,* 358 U.S. 202, 204, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (per curiam); *Meyers v.*

*Pennypack Woods Home Ownership Association, supra* at 898; *Smith v. YMCA,* 462 F.2d 634, 646 (5th Cir. 1972). Accordingly, if the physician plaintiff otherwise has standing to challenge any particular part of Ordinance Number 160–1978, he is not disqualified from doing so by whatever role his desire to participate in this action played in his decision to perform abortions in Akron.

### B.

■ The determination of an individual's standing to litigate a particular claim involves two levels of inquiry. The first level is a result of the restriction of federal court jurisdiction to "Cases" and "Controversies" by Article III of the Constitution. That restriction establishes a floor below which neither the courts nor congress can afford an individual standing to litigate a particular claim. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In order to satisfy Article III's requirement, a plaintiff must have " 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth, supra* (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)) (emphasis in original). "In sum, when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

■ In the present case, Ordinance Number 160–1978 imposes certain regulations upon clinics and physicians providing abortions within the City of Akron. Those regulations are enforced by criminal sanctions that defendants stand ready to enforce. Three of the plaintiffs operate clinics for the provision of abortions in Akron and the fourth is a physician at one of those clinics. Plaintiffs have alleged and proved that

compliance with some of the regulations of the ordinance will result in their suffering economic harm. It is clear, therefore, that, to the extent Ordinance Number 160–1978 regulates specific activities in which these plaintiffs engage, they have standing, in the constitutional sense, to challenge the legality of that regulation.

The second level of inquiry into an individual's standing to litigate is founded upon prudential considerations. It is a matter of "judicial, self-governance." *Warth,* 422 U.S. at 509, 95 S.Ct. 2197. Among the standards in this context is that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth, supra* at 499, 95 S.Ct. at 2205. To the extent plaintiffs have satisfied Article III and seek to raise claims based upon alleged infringement of rights assertedly guaranteed to them, they may clearly do so. To the extent that plaintiffs seek to raise claims based upon alleged infringement of rights of their patients, however, it is necessary to consider whether there is reason to disregard the above quoted general standard.

Cases involving *jus tertii* (the right of a third party) standing can generally be divided into two categories. The first involves litigants who challenge legislation which imposes regulations upon them and, as a result of the regulations imposed, allegedly deprives third parties of constitutional rights. The second category involves litigants who suffer injury because regulations allegedly impairing constitutional rights of third parties are imposed directly on those third parties whose rights the litigants seek to assert. This case is within the first category. That is, plaintiffs allege that regulations imposed directly on them violate rights guaranteed their patients. Such plaintiffs "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren,* 429 U.S. 190, 192–97, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 432 (1974).[4]

Accordingly, to the extent that plaintiffs have alleged and proved that enforcement of parts of Ordinance Number 160–1978 will result in an injury to them and that such injury is likely to be avoided by a favorable decision of their specific claims, they will be permitted to litigate both claims of infringement of rights guaranteed them by the Constitution and claims of infringement of rights guaranteed their patients by the Constitution. When determining plaintiffs' standing to litigate each of their specific claims, therefore, it will only be necessary to inquire into their satisfaction of Article III.

### C.

The Court need next consider plaintiffs' standing to challenge the various individual sections of Ordinance Number 160–1978. As stated above, this consideration can be restricted to an inquiry of whether enforcement of the various sections will result in an injury to plaintiffs and whether that injury would be avoided by a declaration that such sections are unconstitutional. Inasmuch as plaintiffs seek only declaratory and injunctive relief, it is unnecessary to consider whether all of the plaintiffs have standing to challenge a particular section. Rather, a finding that at least one plaintiff has standing will be sufficient.

### 1.

Section 1870.02 requires all abortions to be performed by a physician "licensed to practice medicine in the State of Ohio and such abortion [shall be] performed in a hospital or an abortion facility." An "abortion facility" is defined by Subsection (G) of Section 1870.01 in such a way that it

---

4. Cases falling within the second category present much more difficult problems. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

includes the clinics operated by the corporate plaintiffs. Further, the physician plaintiff and all other persons performing abortions at the clinics are "licensed to practice medicine in the State of Ohio." No plaintiff has expressed a desire to engage in any activity that would be violative of Section 1870.02. Plaintiffs are, therefore, without standing to challenge said section.

### 2.

Section 1870.03 provides that abortions "subsequent to the end of the first trimester" must be performed in a hospital. As found previously, no plaintiff now engages in the performance of abortions subsequent to the first trimester. As further found, the coordinator of Akron Women's Clinic has expressed a desire to provide abortions at that clinic during the early part of the second trimester. If Section 1870.03 were declared unconstitutional, however, such abortions could still not be performed in a clinic because of a preexisting Akron ordinance that is not here under attack. Plaintiffs, therefore, lack standing to challenge Section 1870.03.

### 3.

Subsection (A) of Section 1870.04 provides that a physician shall not perform a post-viability abortion unless "such abortion is necessary to prevent the death of the pregnant woman or to prevent impairment to her health." Such subsection further imposes certain requirements upon physicians who perform such post-viability abortions. "Viable" is defined by Subsection (D) of Section 1870.01 as "potentially able to live outside of the womb of the mother upon premature birth whether resulting from natural causes or an abortion, or otherwise, and whether that potentiality exists in part due to the provision or availability of natural or artificial life-support systems."

As found above, no plaintiff presently engages in the performance of abortions beyond the end of the first trimester. Further, the one plaintiff who expressed a desire to do so, would like to provide abortions only during the early part of the second trimester.[5] Much evidence was presented the Court concerning the earliest point in a woman's pregnancy at which viability was possible. It has not been suggested, however, that viability is possible during the early part of the second trimester. Accordingly, inasmuch as no plaintiff even desires to engage in post-viability abortions, plaintiffs lack standing to challenge subsection (A) of Section 1870.04.

Subsection (B) of Section 1870.04 establishes a "presumption of viability" "if more than twenty-four (24) weeks have elapsed from the probable beginning of the last menstrual period of the pregnant woman . . . ." In such circumstances the subsection imposes certain requirements upon a physician performing an abortion. Inasmuch as no plaintiff has even expressed a desire to engage in activities within the coverage of this subsection, they lack standing to challenge it.

Subsections (C) and (D) of Section 1807.04, respectively, impose certain regulations upon abortions "where the presumption of viability exists," and "of a viable unborn child." Inasmuch as plaintiffs do not engage in the performance of such abortions, they lack standing to challenge these subsections.

### 4.

Subsection (A) of Section 1870.05 imposes a requirement of notification of a parent or guardian prior to the performance of an abortion at the request of an unmarried woman below the age of eighteen.

---

5. Actually, in view of the Court's finding that plaintiffs have no standing to challenge Section 1870.03, the desire to perform abortions during the early part of the second trimester does not increase the standing of Akron Women's Clinic, Inc., beyond that of the other plaintiffs. In light of the fact, however, that even if Akron Women's Clinic, Inc., were able to effectuate its desire to perform abortions during the early second trimester, it would still lack standing to challenge the subsection now under discussion, the Court will analyze this subsection as though such effectuation were possible.

This requirement is imposed upon the attending physician. Inasmuch as the physician plaintiff's patients include women below the age of eighteen, he has standing to challenge this subsection.

▆ Subsection (B) of Section 1870.05 imposes a parental consent requirement prior to the performance of an abortion upon a minor under fifteen years of age. The requirement of obtaining such consent is imposed directly upon the attending physician. Inasmuch as the physician plaintiff's patients include minors below the age of fifteen, he has standing to challenge this subsection.

**5.**

▆ Section 1870.06 imposes "informed consent" requirements applicable to all abortion procedures. The physician plaintiff has standing to challenge this section.

**6.**

Section 1870.07 imposes a twenty-four hour waiting period applicable to all abortion procedures. The physician plaintiff has standing to challenge this section.

**7.**

▆ Sections 1870.08 and 1870.09, respectively, impose recordkeeping and inspection requirements upon "abortion facilities." The corporate plaintiffs, as operators of such facilities, have standing to challenge these sections.

**8.**

▆ Section 1870.10 imposes reporting requirements upon physicians performing abortions. The physician plaintiff has standing to challenge this section.

**9.**

▆ Section 1870.11 imposes duties upon Akron's Department of Public Health concerning the provision of abortion report forms to abortion providers, complication report forms to post-abortion care providers, and provision of "a current list of all public and private agencies and services available for use in accordance with Section 1870.06 (B)(11) and 1870.06(B)(12) of this Chapter," to abortion providers. Plaintiffs have not alleged or proved any injury as a result of this section. They are, therefore, without standing to challenge it.

**10.**

▆ Section 1870.12 provides that certain other sections of the ordinance shall not apply "where there is an emergency need for an abortion to be performed . . . . ." Plaintiffs have not alleged or proved any injury as a result of said section. They are, therefore, without standing to challenge it.

**11.**

▆ Section 1870.13 provides that no municipal hospital shall permit its facilities to be used for the performance of abortions. Plaintiffs have not alleged or proved any injury as a result of this section. They are, therefore, without standing to challenge it.

**12.**

▆ Subsection (A) of Section 1870.14 provides that no "private hospital, hospital director, or governing board of a private hospital . . ." is required to permit the performance of abortions within such hospital. Plaintiffs have failed to allege or prove any injury as a result of said subsection. They are, therefore, without standing to challenge it.

▆ Subsection (B) of Section 1870.14 provides that refusal to perform or participate in the performance of an abortion or post-abortion care cannot be a "basis for disciplinary or other recriminatory action." Any injuries plaintiffs could possibly suffer as a result of this subsection are far too speculative to afford them standing to challenge it in this action.

**13.**

▆ Section 1870.15 is as follows:
No person shall experiment upon or sell a live child or unborn child unless such experimentation is therapeutic to the child or unborn child.

There was no evidence that any plaintiff engages in any activities that would be violative of this section or anticipates doing so in the future. Plaintiffs, therefore, lack standing to challenge Section 1870.15.

### 14.

■ Section 1870.16 provides that a physician who performs an abortion must "insure that the remains of the unborn child are disposed of in a humane and sanitary manner." The physician plaintiff has standing to challenge this section.

### 15.

■ Section 1870.17 requires physicians who perform abortions to provide their patients with oral and written after-care instructions. The physician plaintiff has standing to challenge this section.

### 16.

■ Finally, Section 1870.18 imposes criminal sanctions for violation of the substantive sections of the ordinance. To the extent plaintiffs have standing to challenge the substantive sections, they have standing to challenge this section as well.

### D.

■ As noted previously, some of plaintiffs' claims are addressed to Ordinance Number 160–1978 in its entirety, for example: "Chapter 1870 is as a whole invalid because its purpose was to put as many roadblocks as possible in a woman's path to an abortion, as a means of vindicating a belief that an abortion is the murder of an 'unborn child'." Plaintiffs' post-trial brief at 41. Plaintiffs argue that inasmuch as such claims have applicability to every section of the ordinance, if the Court agrees with their factual assertions, and further agrees that such facts would yield an unconstitutional enactment, it must strike the ordinance "in its entirety." Plaintiffs' characterization of their claims, however, does not relieve this Court of its duty to determine whether plaintiffs have Article III standing to attack the entire ordinance.

■ There are two ways in which plaintiffs could be found to have standing to attack the ordinance in its entirety. The first is that if plaintiffs were to be found to have standing to attack each section of the ordinance individually, they would have standing to attack the whole. Inasmuch as the Court has found plaintiffs lack standing to challenge certain sections individually, this alternative is foreclosed. The second way in which plaintiffs could be found to have standing to challenge the ordinance in its entirety would be by demonstrating that they are injured by some sections of the ordinance and those sections are not severable from the other sections. That is, that the ordinance must be viewed as one unit, not as a legislative scheme consisting of a number of separate units. *See Communist Party v. Subversive Activities Control Board,* 367 U.S. 1, 70–81, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *Electric Bond Co. v. SEC,* 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936 (1938).[6]

---

**6.** As is apparent, plaintiffs' characterization of their claim as an attack on the ordinance "in its entirety" has no practical effect. If the ordinance is truly not severable, a finding that one section is unconstitutional will result in the striking of the entire ordinance regardless of whether the ground for the finding of unconstitutionality is generally applicable to the entire ordinance or whether its applicability is limited to only the one section originally found invalid. (Of course a plaintiff who is affected by one section of an inseverable statutory scheme will not be permitted to challenge the entire scheme based upon the alleged unconstitutionality of a section that has no applicability to him. "[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).) For this reason, examination of an enactment's severability usually occurs after a determination that some or all of the sections under primary attack are unconstitutional. Further, this Court's inquiry at this point into plaintiffs' standing to challenge the ordinance "in its entirety" must be viewed as only a preliminary determination. Severability is a question of fact. That is, the Court must determine legislative intent. At this point the question is simply what was the legislative intent at the time of enactment. If parts of the ordi-

■ The question of whether the various parts of a legislative scheme are severable involves a determination of the legislative intent. In the present case, Section 1870.19, of Ordinance Number 160–1978 provides:

> Should any provision of this Chapter be construed by any court of law to be invalid, illegal, unconstitutional, or otherwise unenforcible, such invalidity, illegality, unconstitutionality, or unenforcibility shall not extend to any other provision or provisions of this Chapter.

Such a statement "provides a rule of construction which may sometimes aid in determining [legislative] intent." "But it is an aid merely; not an inexorable command." *Dorchy v. Kansas*, 264 U.S. 286, 290, 44 S.Ct. 323, 324, 68 L.Ed. 686 (1924). "It has the effect of reversing the presumption which would otherwise be indulged, of an intent that, unless the act operates as an entirety, it shall be wholly ineffective." *Retirement Board v. Alton R. R. Co.*, 295 U.S. 330, 362, 55 S.Ct. 758, 767, 79 L.Ed. 1468 (1935).

■ Although some of the sections of Ordinance Number 160–1978 are closely related to others, all of the sections are not so intertwined that a finding that the ordinance must survive or fail as a single unit is dictated at this point. Accordingly, although plaintiffs have standing to challenge some sections of Ordinance Number 160–1978, the Court cannot now hold that they may challenge the ordinance "in its entirety." Those claims that plaintiffs assert have application to the ordinance as a whole, therefore, will only be considered insofar as they relate to the sections of the ordinance that the Court has found plaintiffs have standing to challenge individually.

nance are stricken, the Court must determine whether the legislature would wish the ordinance to remain without those specific invalid sections. At that point a finding that such would not comply with the legislative intent would result in both a conclusion that plaintiffs have standing to challenge the entire ordinance and that it is invalid "in its entirety."

## IV.

Plaintiffs have raised two claims that, they assert, are applicable to all of the sections of Ordinance Number 160–1978 that they have standing to challenge. The first such claim is that said sections violate the First Amendment's establishment of religion clause. The second such claim is that said sections violate the Fourteenth Amendment's equal protection clause.[7]

### A.

The Supreme Court has established a three-prong test for analyzing the constitutionality of statutes alleged to be violative of the establishment clause:

> [T]o pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, e. g., *Epperson v. Arkansas*, 393 U.S. 97 [, 89 S.Ct. 266, 21 L.Ed.2d 228] (1968), second, must have a primary effect that neither advances nor inhibits religion, e. g., *McGowan v. Maryland*, [366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)]; *School District of Abington Township v. Schempp*, 374 U.S. 203 [, 83 S.Ct. 1560, 10 L.Ed.2d 844] (1963), and, third, must avoid excessive government entanglement with religion, e. g., *Walz v. Tax Comm'n*, [397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)] supra. See *Lemon v. Kurtzman*, supra [403 U.S. 602,] at 612–613 [, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)]; *Tilton v. Richardson*, 403 U.S. 672, 678 [, 91 S.Ct. 2091, 29 L.Ed.2d 790] (1971).

*Committee For Public Education v. Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). Plaintiffs claim that the enactment under consideration fails all three prongs of this test.

7. Plaintiffs also appear to assert that their claim based on the First Amendment's free exercise clause and parts of their claim based on the Fourteenth Amendment's due process clause have general applicability. The Court, however, does not agree and each section will be tested individually to determine whether these claims have merit.

### 1.

Ordinance Number 160–1978 contains a number of "whereas" clauses. The fourth such clause is as follows:

WHEREAS, it is the finding of Council that there is no point in time between the union of sperm and egg, or at least the blastocyst stage and the birth of the infant at which point we can say the unborn child is not a human life, and that the changes occurring between implantation, a six-weeks embryo, a six-month fetus, and a one-week-old child, or a mature adult are merely stages of development and maturation; . . .

 Plaintiffs contend that the belief that human life exists from the time of union of sperm and egg is a religious belief. They further contend that although the above quoted clause is only one of a number of "whereas" clauses, the belief that human life exists from the time of union of sperm and egg was, in fact, the "true" motivation for the passage of Ordinance Number 160–1978. That is, city council hoped to "establish" the belief that human life exists from the union of sperm and egg. Finally, plaintiffs assert that inasmuch as this asserted religious purpose "was, in fact, what the provision's framers sought to achieve," the sections of the ordinance at issue are invalid. Plaintiffs' Post-Trial Brief at 72 (quoting *McDaniel v. Paty*, 435 U.S. 618, 636 n. 9, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring in judgment)). This Court disagrees with plaintiffs' assertions on this prong of the establishment test for at least two reasons.

First, the belief that human life exists from the union of sperm and egg is not clearly and singularly a "religious belief." An individual's belief of when life begins can be based upon scientific or philosophical

belief rather than religious belief. *See Roe*, 410 U.S. at 159, 93 S.Ct. 705. For example, the physician plaintiff in this action testified before this Court as follows concerning the existence of human life from a point prior to the union of sperm and egg:

There is no beginning of life. Life is a continuum. Life started possibly three and a half billion years ago.

The only scientific answer is to when life begins, it is a continuum. There is no beginning.

To refer to it as the moment when sperm and egg meet, it is important; but I would not consider that the beginning of life.

The fourth whereas clause is not inconsistent with the physician plaintiff's "scientific answer." This problem is further complicated by the fact that an individual's belief of when human life exists may be based not singularly upon religious, scientific, or philosophical theories, but upon some combination thereof. This Court cannot, therefore, find that the belief that human life exists from the union of sperm and egg is a "religious belief." [8]

Secondly, even if this Court were to agree that the statement that life exists from the union of sperm and egg is a statement of religious belief, it cannot agree with plaintiffs that it is necessary to look beyond any stated secular purpose in order to determine whether the "true" legislative motivation for enactment of the challenged ordinance was such religious belief.

The basis for plaintiff's contentions is found in a footnote to Mr. Justice Brennan's concurring opinion to the judgment in *McDaniel v. Paty*, 435 U.S. 618, 636 n. 9, 98 S.Ct. 1322, 1333 fn. 9, 55 L.Ed.2d 593 (1978):

Appellant has raised doubt that the purpose ascribed to the provision by the

---

8. The Court recognizes that plaintiffs' position may be that in the minds of the seven members of Akron City Council who voted in favor of Ordinance Number 160–1978, the belief that human life exists from the union of sperm and egg is clearly and singularly a religious belief. If this is plaintiffs' position, they certainly failed to prove their case in this regard. Further, the reasons discussed below that have led

the Court to conclude that it is improper to inquire into what was "in fact" legislators' true motives for adopting certain legislation counsel even more strongly against permitting the bases for legislators' beliefs to be probed in a hope of discovering whether any particular belief is for that individual rooted in religion rather than in some other discipline.

State is, in fact, its actual purpose. He argues that the actual purpose was to enact as law the religious belief of the dominant Presbyterian sect that it is sinful for a minister to become involved in worldly affairs such as politics, Brief for Appellant 58–59, and that the statute therefore violates the Establishment Clause. Although the State's ascribed purpose is conceivable, especially in light of the reasons for disqualification advanced by statesmen at the time the provision was adopted, *see ante*, at 622–625, if it were necessary to address appellant's contention we would determine whether that purpose was, in fact, what the provision's framers sought to achieve. In contrast to the general rule that legislative motive or purpose is not a relevant inquiry in determining the constitutionality of a statute, see *Arizona v. California,* 283 U.S. 423 [, 455, 51 S.Ct. 522, 526, 75 L.Ed. 1154] (1931) (collecting cases), our cases under the Religion Clauses have uniformly held such an inquiry necessary because under the Religion Clauses government is generally prohibited from seeking to advance or inhibit religion. *Epperson v. Arkansas,* 393 U.S. 97 [, 109, 89 S.Ct. 266, 21 L.Ed.2d 228] (1968); *McGowan v. Maryland,* 366 U.S. 420 [, 431–445, 453, 81 S.Ct. 1101, 1108–1115, 1119,, 6 L.Ed.2d 393] (1961); cf. *Grosjean v. American Press Co.,* 297 U.S. 233, 250–251 [, 56 S.Ct. 444, 449, 80 L.Ed. 660] (1936). In view of the disposition of this case, it is unnecessary to explore the validity of appellant's contention, however.

Although Mr. Justice Brennan's statement does imply the necessity of a determination of the "true" legislative motivation, such statement is dicta and this Court will not follow its implication for two reasons. First, the cases cited clearly do not demonstrate the necessity of such an inquiry. Secondly, such an inquiry is not supported by reason.

Mr. Justice Brennan cited two cases as directly supporting his thesis and a third as supporting "a proposition different from that in text but sufficiently analogous to lend support." The Harvard Law Review Ass., A Uniform System of Citation 7 (12th ed. 1976). The first case cited was *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

*Epperson* involved a challenge to Arkansas' 1928 "anti-evolution" statute. The challenged statute prohibited the teaching of the theory that man evolved from other species of life in the state's public schools and universities. The Supreme Court found the statute violative of the First Amendment's establishment clause.

There is language in the Court's opinion that, when viewed in isolation, appears to support Mr. Justice Brennan's thesis:

The overriding fact is that Arkansas' law selects from the body of knowledge a particular segment which it proscribes *for the sole reason* that it is deemed to conflict with a particular religious doctrine; that is, with a particular interpretation of the Book of Genesis by a particular religious group.

. . . . .

[The Arkansas statute's] antecedent, Tennessee's "monkey law," candidly stated its purpose: to make it unlawful "to teach any theory that denies the story of the Divine Creation of man as taught in the Bible, and to teach instead that man has descended from a lower order of animals." Perhaps the sensational publicity attendant upon the *Scopes* trial induced Arkansas to adopt less explicit language. It eliminated Tennessee's reference to "the story of the Divine Creation of man" as taught in the Bible, but *there is no doubt that the motivation for the law was the same:* to suppress the teaching of a theory which, it was thought, "denied" the divine creation of man.

*Epperson,* 393 U.S. at 103, 108–09, 89 S.Ct. at 273 (emphasis added) (footnotes omitted). When viewed in context, however, it becomes clear that the words chosen by the Court were not intended to relay the broad holding for which Mr. Justice Brennan cited *Epperson.*

The Court in *Epperson* did not decide that the Arkansas legislature's "true" motive for enactment of its challenged "monkey" law was religious rather than one of a number of possible secular purposes as plaintiffs ask this Court to do in the present case. Rather, the Court found no possible secular purpose to support the challenged statute and, from that finding, concluded that the legislature had to have acted based upon a religious motivation:

> No suggestion has been made that Arkansas' law may be justified by considerations of state policy other than the religious views of some of its citizens. It is clear that fundamentalist sectarian conviction was and is the law's reason for existence.

*Epperson supra* at 107–08, 89 S.Ct. at 272 (footnotes omitted).[9] That this is the true significance of the Court's opinion in *Epperson* becomes quite clear upon examination of a statement contained in Mr. Justice Black's concurring opinion:

> I find it difficult to agree with the Court's statement that "there can be no doubt that Arkansas has sought to prevent its teachers from discussing the theory of evolution because it is contrary to the belief of some that the Book of Genesis must be the exclusive source of doctrine as to the origin of man." It may be

instead that the people's motive was merely that it would be best to remove this controversial subject from its schools; there is no reason I can imagine why a State is without power to withdraw from its curriculum any subject deemed too emotional and controversial for its public schools. And this Court has consistently held that it is not for us to invalidate a statute because of our views that the "motives" behind its passage were improper; it is simply too difficult to determine what those motives were.

*Epperson, supra* at 112–13, 89 S.Ct. at 274–275 (Black, J., concurring) (citation omitted). Mr. Justice Black did not fault the majority opinion as departing from previous holdings that inquiry into legislative "motives" is not appropriate. Rather, he criticized the majority for its refusal to recognize his proffered possible secular purpose.

The Court's opinion in *Epperson*, therefore, when viewed in its entirety, cannot be said to dictate adoption of Mr. Justice Brennan's dicta. Rather, the Court's opinion stands for the proposition for which it was cited by the Court in *Nyquist*, "to pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose . . . ." *Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965,

---

**9.** A footnote appearing at the end of the above quoted sentences, again, could be read as implying the necessity for an extensive inquiry into the "true" motive for a particular piece of legislation:

> The following advertisement if typical of the public appeal which was used in the campaign to secure adoption of the statute: "THE BIBLE OR ATHEISM, WHICH?
>
> "All atheists favor evolution. If you agree with atheism vote against Act No. 1. If you agree with the Bible vote for Act No. 1 . . . Shall conscientious church members be forced to pay taxes to support teachers to teach evolution which will undermine the faith of their children? The Gazette said Russian Bolshevists laughed at Tennessee. True, and that sort will laugh at Arkansas. Who cares? Vote FOR ACT NO. 1." The Arkansas Gazette, Little Rock, Nov. 4, 1928, p. 12, cols. 4–5.
>
> Letters from the public expressed the fear that teaching of evolution would be "subversive of Christianity," *id.*, Oct. 24, 1928, p. 7,

col. 2; see also *id.*, Nov. 4, 1928, p. 19, col. 4; and that it would cause school children "to disrespect the Bible," *id.*, Oct. 27, 1928, p. 15, col. 5. One letter read: "The cosmogony taught by [evolution] runs contrary to that of Moses and Jesus, and as such is nothing, if anything at all, but atheism. . . . Now let the mothers and fathers of our state that are trying to raise their children in the Christian faith arise in their might and vote for this anti-evolution bill that will take it out of our tax supported schools. When they have saved the children, they have saved the state." *Id.*, at cols. 4–5.

Again, however, when viewed in context, it does not appear that such an implication was intended. The Court did not examine the materials to which reference was made in an attempt to discover the "true" legislative purpose, rather, in its effort to find the statute constitutional, the Court examined the referenced materials in search of a possible secular purpose.

37 L.Ed.2d 948 (citing *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).[10]

The second case cited by Mr. Justice Brennan to support his thesis was *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Again, although parts of the Court's opinion permit an inference that it is necessary to determine the "true" purpose of a legislative enactment challenged under the establishment clause, examination of the entire opinion dispels any such inference.[11]

The appellants in *McGowan* were seven employees of a discount department store who had been convicted of violating Maryland's Sunday closing law. They appealed to the Supreme Court contending that the law under which they had been convicted was violative of the establishment clause.

The Court's opinion upholding appellants' convictions included an extensive historical discussion of Sunday closing laws in general. It concluded that although the purpose for early closing laws was to encourage religious participation, in more modern times numerous secular reasons have been advanced to support such laws. The Court acknowledged that legislation with a secular justification is not invalid because it coincidentally advances a religious doctrine:

The "Establishment" Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation. Thus, for temporal purposes, murder is illegal. And the fact that this agrees with the dictates of the Judaeo-Christian religions while it may disagree with others does not invalidate the regulation. So too with the questions of adultery and polygamy. . . . The same could be said of theft, fraud, etc., because those offenses were also proscribed in the Decalogue.

*McGowan, supra* at 442, 81 S.Ct. at 1113–1114. Finally, the Court addressed the Maryland statute under attack. Initially the Court examined the face of the Maryland statute; next it examined that particular statute's predecessors; finally, the Court examined decisions of the Maryland courts for statements of purposes underlying the statute. The Court concluded:

After engaging in the close scrutiny demanded of us when First Amendment liberties are at issue, we accept the State Supreme Court's determination that the statutes' present purpose and effect is not

---

**10.** The Supreme Court's analysis of the first prong of the establishment clause test in *Nyquist* is particularly instructive. Plaintiffs in *Nyquist* challenged certain amendments to New York's education and tax laws providing financial aid to nonpublic elementary and secondary schools. Plaintiffs asserted that the amendments, by providing funds to schools that taught religious doctrines, violated the establishment clause. The Court's analysis of the first prong of the establishment clause was complete upon the discovery of possible secular purposes and no effort was made to discover the "true" purpose:

[W]e need touch only briefly on the requirement of a "secular legislative purpose." As the recitation of legislative purposes appended to New York's law indicates, each measure is adequately supported by legitimate, nonsectarian state interests. We do not question the propriety, and fully secular content, of New York's interest in preserving a healthy and safe educational environment for

all of its schoolchildren. And we do not doubt—indeed, we fully recognize—the validity of the State's interests in promoting pluralism and diversity among its public and nonpublic schools. Nor do we hesitate to acknowledge the reality of its concern for an already overburdened public school system that might suffer in the event that a significant percentage of children presently attending nonpublic schools should abandon those schools in favor of the public schools.
*Nyquist*, 413 U.S. at 773, 93 S.Ct. at 2966.

**11.** Mr. Justice Black was part of the majority that upheld Maryland's Sunday closing law in *McGowan*. Seven years later, when he wrote his concurrence to the Court's decision in *Epperson*, he apparently did not view *McGowan* as having been a departure from the Court's consistent holdings that inquiry into "motives" behind legislative enactments is not appropriate. *See* text, *supra* at 1191.

to aid religion but to set aside a day of rest and recreation.

*McGowan, supra* at 449, 81 S.Ct. at 1117.

When the Court's opinion is viewed as a whole, there are a number of indications that it was not intended to imply a necessity for the discovery of "true" legislative purpose. Rather, it seems more accurate to state the Court's holding as being that the "true" purpose of early closing statutes was religious; that there now exist numerous possible secular purposes; that the face of Maryland's statute does not reveal that the legislature acted solely for religious purposes; and finally that decisions of Maryland's courts did not reveal that the purpose of the statute was religious.[12] Accordingly, rather than supporting the thesis that it is necessary to discover the legislature's "true" purpose, *McGowan* indicates that if there are possible secular purposes to support a certain enactment and it does not clearly appear from an examination of the face of the enactment, and any relevant state court decisions, that the legislature's "true" motive was not to advance those secular purposes, the enactment is not violative of the establishment clause.

The case cited by Mr. Justice Brennan as lending indirect support for his thesis was *Grosjean v. American Press Co.*, 297 U.S. 233, 250–251, 56 S.Ct. 444, 80 L.Ed. 660 (1936). The Court's opinion in *Grosjean* also contains some language that, when viewed in isolation, appears to support his thesis. When viewed as a whole, however, as found by the Supreme Court in a subsequent decision, the Court's opinion in *Grosjean* does not support the need to discover the "true" legislative intent:

[Defendant's] position, and to some extent that of the court below, rest upon a misunderstanding of *Grosjean v. American Press Co.*, 297 U.S. 233 [, 56 S.Ct. 444, 80 L.Ed. 660] (1936), and *Gomillion v. Lightfoot*, 364 U.S. 339 [, 81 S.Ct. 125, 5 L.Ed.2d 110] (1960). These cases stand, not for the proposition that legislative motive is a proper basis for declaring a statute unconstitutional, but that the inevitable effect of a statute on its face may render it unconstitutional. Thus, in *Grosjean* the Court, having concluded that the right of publications to be free from certain kinds of taxes was a freedom of the press protected by the First Amendment, struck down a statute which on its face did nothing other than impose just such a tax. Similarly, in *Gomillion*, the Court sustained a complaint which, if true, established that the "inevitable effect," 364 U.S., at 341 [, 81 S.Ct. 127,] of the redrawing of municipal boundaries was to deprive the petitioners of their right to vote for no reason other than

12. It is unclear how state court decisions serve as a clue to the "true" legislative purpose. Further, in regard to the Court's inquiry into possible secular purposes, once at least one such possible secular purpose is discovered, such inquiry cannot be considered an inquiry into whether the "true" purpose was religious. The only part of the Court's analysis that could be termed an attempt to discover the "true" legislative purpose, therefore, was its examination of the face of the statute. It is interesting that to the extent any such evidence appeared on the face of the statute, it makes the "true" purpose, at the time of enactment, appear to have been religious:

The title of the major series of sections of the Maryland Code dealing with Sunday closing —Art. 27, §§ 492–534C—is "Sabbath Breaking"; § 492 proscribes work or bodily labor on the "Lord's day," and forbids persons to "profane the Lord's day" by gaming, fishing et cetera; § 522 refers to Sunday as the "Sabbath day." As has been mentioned above, many of the exempted Sunday activities in the various localities of the State may only be conducted during the afternoon and late evening; most Christian church services, of course, are held on Sunday morning and early Sunday evening. Finally, as previously noted, certain localities do not permit the allowed Sunday activities to be carried on within one hundred yards of any church where religious services are being held. This is the totality of the evidence of religious purpose which may be gleaned from the face of the present statute and from its operative effect.

Finally, in light of the Court's conclusion that the statute's "present purpose and *effect* is not to aid religion", *McGowan, supra* at 449, 81 S.Ct. 1101 (emphasis added), perhaps it would be more accurate to characterize most of the Court's analysis as an examination of the statute's "primary effect" rather than the legislative purpose. *See Nyquist*, 413 U.S. at 773, 93 S.Ct. 2955.

that they were Negro. In these cases, the purpose of the legislation was irrelevant, because the inevitable effect—the "necessary scope and operation," *McCray v. United States*, 195 U.S. 27, 59 [, 24 S.Ct. 769, 49 L.Ed. 78] (1904)—abridged constitutional rights. The statute attacked in the instant case has no such inevitable unconstitutional effect, since the destruction of Selective Service certificates is in no respect inevitably or necessarily expressive. Accordingly, the statute itself is constitutional.

*United States v. O'Brian*, 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968).

As stated previously, in addition to not being supported by the cases cited, Mr. Justice Brennan's thesis is not supported by reason. "[I]t is simply too difficult to determine what [the "true" legislative] motives were." *Epperson*, 393 U.S. at 113, 89 S.Ct. at 275 (Black, J., concurring). Some of the difficulties with such an inquiry were acknowledged in the Court's opinion in *O'Brian*:

Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes

are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

391 U.S. at 383–84, 88 S.Ct. at 1683 (footnote omitted).[13]

■■■ Based on the foregoing, the Court concludes that the relevant inquiry on the first prong of the establishment of religion test is whether there is a possible secular purpose to support Ordinance Number 160–1978. Clearly, there are numerous such possible purposes, including the state's valid interests in maternal health and the potentiality of human life. *Roe*, 410 U.S. at 148–150, 93 S.Ct. 705. Accordingly, those parts of Ordinance Number 160–1978 under consideration do not fail the first prong of the establishment clause test.[14]

2.

■■■ The second prong of the establishment clause test is whether the challenged legislation has a "primary effect" of advancing or inhibiting religion. Plaintiffs have presented little argument on this prong of the establishment test. In substance, they have argued that Ordinance Number 160–1978 will have an effect of discouraging some women from choosing to have an abortion; some religious groups do not believe that abortions are appropriate; therefore, the ordinance has a primary effect of furthering a religious doctrine.

The Court cannot agree with plaintiffs' arguments. Rather than demonstrating that the ordinance has a "primary" effect of furthering religion they have shown only an indirect effect in that regard. Rather,

---

**13.** Mr. Justice Brennan was among the justices constituting the majority in *O'Brian*.

**14.** The Court feels constrained to note two things at this point. Although the existence of possible secular purposes to support the ordinance permits it to survive the first prong of the establishment clause test, to the extent that the ordinance's effect is an infringement upon a fundamental right, it must further a compelling state interest. *See Roe*, 410 U.S. 113, 93 S.Ct. 705. *But see* text accompanying notes 19 & 20 *infra*. Further, the Court expresses no view concerning the constitutionality of an enactment that concludes on its face a statement that its only purpose is to further a religious belief. *See McGowan*, 366 U.S. at 432–33, 81 S.Ct. 1101.

the primary effect is to impose regulations upon the performance of a medical procedure. To the extent that certain sections of the ordinance interfere with a woman's privacy right to decide to terminate her pregnancy without furthering a compelling state interest, that particular section will be found violative of the due process clause of the Fourteenth Amendment. Whatever incidental effect that such section would also have on that woman's religious beliefs, however, it could not be termed a "primary effect" of advancing or inhibiting religion.

### 3.

■ The third prong of the establishment clause test is whether the challenged enactment results in excessive government entanglement with religion. That is, whether the ordinance results in a relationship between the church and state that calls for "official and continuing surveillance leading to an impermissible degree of entanglement." *Walz v. Tax Commission*, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). The Court does not see how the third prong of the establishment clause test has any application to Ordinance Number 160–1978.[15]

---

**15.** Plaintiffs appear to rely on two things to contend that the ordinance under discussion results in excessive entanglement. First, they rely upon the Court's discussion of "political division along religious lines" in *Lemon v. Kurtzman*, 403 U.S. 602, 622–623, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Examination of that opinion, however, reveals that the Court was warning of division resulting from continued regulation of churches, a situation not present in this case:

Here we are confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmentation and divisiveness on religious lines are thus likely to be intensified. The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow.

*Lemon, supra* at 623, 91 S.Ct. at 2116. Secondly, they rely on a passage from Mr. Justice Harlan's concurring opinion in *Walz v. Tax Commissioner*, 397 U.S. 664, 695, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970):

[G]overnment involvement, while neutral, may be so direct or in such degree as to

### B.

■ Plaintiffs characterize their other claim that is addressed to all the sections of the ordinance that they have standing to challenge as being based on the equal protection clause of the Fourteenth Amendment. Their claim is that such sections are unconstitutional because Akron does not similarly regulate other comparable medical procedures:

This singling out of abortion "treats differently without a compelling reason medical procedures which in terms of health risk are not distinguishable". *Friendship Medical Center v. Chicago Board of Health,* 505 F.2d 1141, 1153, (7th Cir. 1974). For this reason Chapter 1870 *as a whole* violates the Equal Protection Clause of the Fourteenth Amendment and should be declared unconstitutional. Such action was taken in *Friendship Medical Center v. Chicago Board of Health, supra; Word v. Poelker,* 495 F.2d 1349 (8 Cir. 1974); and *Mahoning Women's Center v. Hunter,* 444 F.Supp. 12, 17 (N.D.Ohio 1977).

Plaintiffs' post-trial brief at 69 (emphasis in original). Although there is language in

engender a risk of politicizing religion. Thus, as the opinion of The Chief Justice notes, religious groups inevitably represent certain points of view and not infrequently assert them in the political arena, as evidenced by the continuing debate respecting birth control and abortion laws. Yet history cautions that political fragmentation on sectarian lines must be guarded against.

Examination of the quoted passage in context reveals that Mr. Justice Harlan was acknowledging that debate respecting birth control and abortion is an example of political involvement by religious groups that is acceptable. What is violative of the third prong of the establishment clause test is not legislative enactments that to a certain extent result from political involvement of religious groups, but rather legislative enactments that will result in continuing involvement of the state in regulating church affairs:

Of course, as the Court noted in *Walz,* "[a]dherents of particular faiths and individual churches frequently take strong positions on public issues." *Walz v. Tax Commission, supra,* at 670 [, 90 S.Ct. 1412]. We could not expect otherwise, for religious values pervade the fabric of our national life.

*Lemon, supra* 403 U.S. at 623, 91 S.Ct. at 2116.

the opinions of the Supreme Court and of lower courts that seems to imply that regulating abortion differently than other medical procedures results in an equal protection problem, *see, e. g., Bellotti v. Baird (Bellotti I)*, 428 U.S. 132, 148–50, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Mahoning Women's Center v. Hunter*, 444 F.Supp. 12, 17 (N.D. Ohio 1977), this Court is convinced that such different treatment of medical procedures does not implicate the equal protection clause.[16]

■■■■ The equal protection clause is implicated by legislative enactments that burden people within a particular group while not burdening people not in that group.[17] Generally, there must be a rational basis to support the legislative classification. Certain classifications, however, are considered "suspect" and, as a result, are subject to a "compelling state interest test" (i. e. race). To the extent that it is possible

to view the sections challenged in this action as "classification" enactments, no suspect classification of people is involved and it is only necessary to apply a "rational basis test."[18]

■■■ The analysis of plaintiffs' equal protection claim, however, cannot stop here. The Supreme Court has appeared, at times, to apply a strict scrutiny test under the equal protection clause to statutes that do not involve suspect classifications:

> We must decide, first, whether the [challenged enactment] operates to the disadvantage of some suspect class *or impinges upon a fundamental right explicitly or implicitly protected by the Constitution*, thereby requiring strict judicial scrutiny. . . . If not, the [enactment] must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does

---

16. Much of the confusion concerning whether different treatment of comparable medical procedures implicates the equal protection clause can be traced to the following language:

> In Georgia, there is no restriction on the performance of nonabortion surgery in a hospital not yet accredited by the JCAH so long as other requirements imposed by the State, such as licensing of the hospital and of the operating surgeon, are met. . . .
> We hold that the JCAH-accreditation requirement does not withstand constitutional scrutiny in the present context. It is a requirement that simply is not "based on differences that are reasonably related to the purposes of the Act in which it is found."

*Doe v. Bolton*, 410 U.S. 179, 193–94, 93 S.Ct. 739, 748, 749, 35 L.Ed.2d 201 (1973) (quoting *Morey v. Doud*, 354 U.S. 457, 465, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957)). Superficially, this appears to be equal protection analysis mandated by different classifications of medical procedures. This misconception is encouraged by the fact that *Morey* clearly presented an equal protection question. Close examination of the following language, however, reveals that the analysis applied was due process, not equal protection, analysis:

> Some courts have held that a JCAH-accreditation requirement is an *overbroad infringement of fundamental rights because it does not relate to the particular medical problems and dangers of the abortion operation.* . .

*Doe supra* 410 U.S. at 194, 93 S.Ct. at 748 (emphasis added). The purpose of looking at what Georgia required in comparable situations was to gain insight into whether there was a

valid state interest for the particular regulation thereby permitting it to stand under the due process clause. If it was not required for other similar procedures and further was not something that was required by a unique aspect of the abortion procedure, it would be strong evidence of the absence of a valid state interest. There are numerous "clues" in the Supreme Court's abortion decisions that what superficially appears to be an equal protection analysis is, in fact, something else. One of these "clues" is as follows:

> We could not say that a requirement imposed by the State that a prior written consent for any surgery would be unconstitutional. As a consequence, we see no constitutional defect in requiring it only for some types of surgery as, for example, an intracardiac procedure, or where the surgical risk is elevated above a specified mortality level, or, for that matter, for abortions.

*Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 67, 96 S.Ct. 2831, 2840, 49 L.Ed.2d 788 (1976) (footnote omitted).

17. Or, in the alternative, benefits people not in a particular group while not benefiting people within the group.

18. The relevant classification would have to be either women desiring abortions versus women desiring other comparable medical procedures or doctors performing abortions versus doctors performing other comparable medical procedures. Neither presents a "suspect" classification.

not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. *San Antonio School District v. Rodriquez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973) (emphasis added). It is incorrect, however, to consider this "second-branch" as truly being a part of equal protection analysis. *But see, e. g., Maher v. Roe,* 432 U.S. 464, 470–74, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).[19] The so-called second branch of the equal protection clause analy-

sis is, in reality, not founded upon the equal protection clause, but rather, is simply the test applied to any law that allegedly, "impinges upon a substantive right or liberty created or conferred by the Constitution. . . ." *San Antonio School District, supra,* 411 U.S. at 61, 93 S.Ct. at 1311 (Stewart, J. concurring).[20] Therefore, there is no need to separately apply "second branch" of the equal protection clause test. Any section of the ordinance that would fail under this test will do so under the Court's due process analysis.[21] Further, there is no rea-

---

**19.** In *Maher* the Court considered the constitutionality of Connecticut's decision to not provide medicaid benefits for first term abortions but to continue to provide such benefits for births. The Court initially determined that indigent women desiring abortions was not a suspect class. Only a rational basis test was necessary under the "first branch of the equal protection test." The Court next determined that the state's refusal to fund abortions placed "no obstacles—absolute or otherwise—in the pregnant woman's path" to exercise her freedom to decide whether to terminate her pregnancy. *Maher, supra,* 432 U.S. at 474, 97 S.Ct. at 2382.

**20.** Mr. Justice Stewart's analysis was as follows:

Unlike other provisions of the Constitution, the Equal Protection Clause confers no substantive rights and creates no substantive liberties. The function of the Equal Protection Clause, rather, is simply to measure the validity of *classifications* created by state laws.

There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes. And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious. . . .

This doctrine is no more than a specific application of one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law. . . .

Under the Equal Protection Clause, this presumption of constitutional validity disappears when a State has enacted legislation whose purpose or effect is to create classes based upon criteria that, in a constitutional sense, are inherently "suspect." Because of the historic purpose of the Fourteenth Amendment, the prime example of such a

"suspect" classification is one that is based upon race. . . . But there are other classifications that, at least in some settings, are also "suspect"—for example, those based upon national origin, alienage, indigency, or illegitimacy.

Moreover, quite apart from the Equal Protection Clause, a state law that impinges upon a substantive right or liberty created or conferred by the Constitution is, of course, presumptively invalid, whether or not the law's purpose or effect is to create any classifications. *For example, a law that provided that newspapers could be published only by people who had resided in the State for five years could be superficially viewed as invidiously discriminating against an identifiable class in violation of the Equal Protection Clause. But, more basically, such a law would be invalid simply because it abridged the freedom of the press.* Numerous cases in this Court illustrate this principle.

*San Antonio School District, supra,* 411 U.S. at 59–61, 93 S.Ct. at 1310–1311 (footnotes and citations omitted) (emphasis added). *See Shapiro v. Thompson,* 394 U.S. 618, 658, 663, 89 S.Ct. 1322, 22 L.Ed.2d 600 (Harlan, J. dissenting).

**21.** The inappropriateness of considering the "second branch" as a part of equal protection analysis becomes clear when viewed in light of a proposal that plaintiffs have asserted was under consideration by Akron's City Council. Plaintiffs alleged that City Council considered imposing reporting and inspection regulations on all facilities in Akron that performed medical procedures comparable to abortions. According to plaintiffs, the proposal was abandoned because of the expense involved in enforcing it. If such regulations had been imposed, that is, if Akron regulated tooth extractions in the same manner it regulated abortions, the abortion regulations would survive plaintiffs' so-called equal protection analysis. If, however, the abortion regulations infringed upon the constitutional right of privacy and were not supported by a compelling state inter-

son to consider whether sections of the ordinance not impinging upon constitutional rights could withstand the equal protection clause's rational basis test because any sections that could not do so will also fail under the Court's due process analysis.

## V.

As noted previously, as well as asserting that sections of Ordinance Number 160–1978 infringe their patients' constitutional rights, plaintiffs claim that certain sections violate rights allegedly guaranteed them (plaintiffs) by the Constitution. Among the rights assertedly guaranteed plaintiffs by the Constitution and violated by parts of Ordinance Number 160–1978 are: (1) "[t]he right of a physician to practice medicine in accordance with his or her best medical judgment;" (2) "[t]he right of a physician to give . . . medical treatment and advice, in accordance with accepted medical standards, pertaining to the decision whether to terminate a pregnancy;" and (3) "[t]he rights of the plaintiff clinics to provide . . . counseling, education and other services relevant to the making and effectuation of the abortion decision." Fourth Amended Complaint.

■ Initially, there is clearly no recognized constitutional right that guarantees a physician freedom to practice medicine free of state regulation. Further, there is no greater need for such freedom for a doctor than for a member of any vocation.

■ In regard to plaintiffs' second and third asserted constitutional rights, assisting an individual woman to exercise a right guaranteed her by the Constitution cannot be viewed as affording plaintiffs any independent constitutional rights. The Supreme Court considered such a claim in *Whalen v. Roe*, 429 U.S. 589, 604 n.33, 97 S.Ct. 869, 879 fn. 33, 51 L.Ed.2d 64 (1977):

The doctors rely on two references to a physician's right to administer medical care in the opinion in *Doe v. Bolton*, 410 U.S. at 197–198, and 199 [, 93 S.Ct., at

750, and 751, 35 L.Ed.2d 201]. Nothing in that case suggests that a doctor's right to administer medical care has any greater strength than his patient's right to receive such care. The constitutional right vindicated in *Doe* was the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference. The statutory restrictions on the abortion procedures were invalid because they encumbered the woman's exercise of that constitutionally protected right by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision. If those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physician's work more laborious or less independent without any impact on the patient, they would not have violated the Constitution.

To the extent plaintiffs rely on asserted constitutional rights to practice medicine in general or to assist women in obtaining abortions, therefore, their challenge to the sections under discussion must fail.

## VI.

Plaintiffs' primary claim regarding the various sections of Ordinance Number 160–1978 is that they violate, "[t]he right of [plaintiffs'] patients to make and effectuate the decision to terminate their pregnancy. . . ." Fourth Amended Complaint. Initially, the Court will discuss this right and its implications for regulations imposed upon individuals providing abortion related services in general. The Court will then address the specific sections of Ordinance Number 160–1978 in order to determine whether they are violative of this or any other right guaranteed by the Constitution.

## A.

In *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Su-

est, they would be invalid under due process analysis. Treating enactments under the so-called "second branch" of the equal protection

test serves to add confusion and has no corresponding benefit.

preme Court held that the Fourteenth Amendment's protection of certain aspects of personal privacy included a guarantee that a woman could decide whether to terminate her pregnancy without unjustified state interference. The Court further recognized, however, that the privacy right was "not unqualified and must be considered against important state interests in regulation." Inasmuch as the woman's right to make an unencumbered decision concerning abortion was found in the "fundamental right" of privacy, the Court stated that interference with that right could be justified only by a "compelling state interest." *Roe, supra* at 155, 93 S.Ct. 705. The Court further recognized that the state had a valid interest in maternal health and the protection of potential human life. Those interests become compelling at different times during the course of pregnancy and, as a result, permit the state to impose certain regulations after the close of the first trimester. *Roe, supra* at 162–64, 93 S.Ct. 705. The issues presently before this Court, however, concern only the application of regulations during the first trimester because that is the extent of plaintiffs' standing. The Court in *Roe* held that during the first trimester, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." *Roe, supra* at 164, 93 S.Ct. at 732.

A number of lower courts following *Roe* interpreted it as forbidding all regulation of first term abortion providers. *E. g., Friendship Medical Center v. Chicago Bd. of Health,* 505 F.2d 1141, 1148–52 (1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), however, the Supreme Court upheld a regulation requiring a patient's written informed consent to a first trimester abortion and a second regulation placing certain recordkeeping requirements upon first trimester abortion providers. While acknowledging that *Roe* establishes that the state "may not restrict the decision of the patient and her physician regarding abortion during the first stage of pregnancy," the Court held, in regard to the informed consent requirement:

> The decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent.
>
> We could not say that a requirement imposed by the State that a prior written consent for any surgery would be unconstitutional. As a consequence, we see no constitutional defect in requiring it only for some types of surgery as, for example, an intracardiac procedure, or where the surgical risk is elevated above a specified mortality level, or, for that matter, for abortions.

*Danforth, supra* at 67, 96 S.Ct. at 2840. It was not clear from the above quoted language whether the Court was finding a compelling state interest in insuring informed consent or applying a lesser standard. It is quite clear, however, that it applied a lesser standard in considering the regulation imposing recordkeeping requirements:

> As to the first stage, one may argue forcefully, as the appellants do, that the State should not be able to impose any recordkeeping requirements that significantly differ from those imposed with respect to other, and comparable, medical or surgical procedures. We conclude, however, that the provisions of §§ 10 and 11, while perhaps approaching permissible limits, are not constitutionally offensive in themselves. Recordkeeping of this kind, if not abused or overdone, *can be useful* to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment.

*Danforth, supra,* at 80–81, 96 S.Ct. at 2846 (emphasis added). In *Bellotti I,* 428 U.S. at

147, 96 S.Ct. at 2866, the Court explained its decision in *Danforth* not to strike the informed consent requirement as follows:

> In *Planned Parenthood of Central Missouri v. Danforth*, we today struck down a statute that created a parental veto. . . . At the same time, however, we held that a requirement of written consent on the part of a pregnant adult is not unconstitutional unless it *unduly burdens the right to seek an abortion.*

(Emphasis added.)

Subsequently, the Court expanded upon its explanation of the decision in *Danforth*:

> [I]n *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 70–71, n.11 [, 96 S.Ct. 2831, 49 L.Ed.2d 788] (1976), we held that Missouri's requirement of spousal consent was unconstitutional because it "granted [the husband] the right to prevent unilaterally, and for whatever reason, the effectuation of his wife's and her physician's decision to terminate her pregnancy." Missouri had interposed an "*absolute obstacle* to a woman's decision that *Roe* held to be constitutionally protected from such interference." (Emphasis added.) Although a state-created obstacle need not be absolute to be impermissible, see *Doe v. Bolton*, 410 U.S. 179 [, 93 S.Ct. 739, 35 L.Ed.2d 201] (1973), *Carey v. Population Services International*, 431 U.S. 678 [, 97 S.Ct. 2010, 52 L.Ed.2d 675] (1977), we have held that a requirement for a lawful abortion "is not unconstitutional unless it unduly burdens the right to seek an abortion." *Bellotti v. Baird*, 428 U.S. 132 [, 147, 96 S.Ct. 2857, 49 L.Ed.2d 844] (1976). We recognized in *Bellotti* that "not all distinction between abortion and other procedures is forbidden" and that "[t]he constitutionality of such distinction will depend upon its degree and the justification for it." *Id.*, at 149–150 [, 96 S.Ct. 2857].

*Maher v. Roe*, 432 U.S. 464, 473, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977).

 It becomes clear, therefore, from an examination of the cases decided since *Roe*, that not all regulation of first trimester abortion providers is impermissible. An absolute prohibition of first trimester abortions could only be justified by a compelling state interest. Likewise, regulations that afford the power to veto a woman's decision to terminate her pregnancy must be supported by a compelling state interest. *See Danforth*, 428 U.S. at 67–72, 96 S.Ct. 2831. Regulations that interfere with a woman's privacy to a lesser degree, however, require a lesser showing by the state to withstand constitutional attack: "As *Whalen* [*v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)] makes clear, the right in *Roe v. Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it." *Maher, supra* 432 U.S. at 473, 97 S.Ct. at 2382.

 Accordingly, the Court must determine the degree that each section of Ordinance Number 160–1978 interferes with a woman's constitutional right, in consultation with her physician, to choose to terminate her pregnancy. That interference must then be weighed against any valid state interest furthered by such section. Finally, it will be necessary to consider the combined effect of all the various sections not independently unconstitutional to determine whether their combined impact results in such a degree of interference with the constitutional right at issue to result in a finding of invalidity.[22]

### B.

### 1.

The first section of Ordinance Number 160–1978 that plaintiffs have standing to

---

**22.** Every regulation imposed upon first trimester abortions is going to have some impact upon a woman's right to decide to terminate her pregnancy. That is, any regulation that makes "the physician's work more laborious or less independent," *Whalen v. Roe*, 429 U.S. 589, 605 n.33, 97 S.Ct. 869, 879 fn.33, 51 L.Ed.2d 64 (1977), is, at least, going to make it more expensive for a woman to effectuate her abortion decision. If the combined weight of a number of regulations, not independently unconstitutional, were to serve to make it unduly burdensome for a woman to carry out her decision, those sections would be invalid.

challenge is Section 1870.05, "Notice and Consent." The Court will consider the two subsections of this section in reverse order.

a.

Subsection (B) imposes a parental consent requirement prior to the performance of an abortion on a minor under the age of fifteen:

(B) No physician shall perform or induce an abortion upon a minor pregnant woman under the age of fifteen (15) years without first having obtained the informed written consent of the minor pregnant woman in accordance with Section 1870.06 of this Chapter, and

(1) First having obtained the informed written consent of one of her parents or her legal guardian in accordance with Section 1870.06 of this Chapter, or

(2) The minor pregnant woman first having obtained an order from a court having jurisdiction over her that the abortion be performed or induced.

In *Planned Parenthood of Central Missouri v. Danforth, supra* 428 U.S. at 72–75, 96 S.Ct. 2831, the Supreme Court found a blanket parental consent requirement for all unmarried minors under the age of eighteen invalid. The Court specifically noted, however, that its holding should not be read as a suggestion that all minors have the capability of giving effective consent to the performance of an abortion. The problem with the section there under consideration was that it applied to all minors:

Any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the *competent* minor mature enough to have become pregnant.

*Danforth, supra* at 75, 96 S.Ct. at 2844 (emphasis added).

The fact that the key to a parental consent requirement to the performance of an abortion is the pregnant minor's ability to give valid informed consent is clear from the recent decision in *Bellotti v. Baird (Bellotti II)*, —— U.S. ——, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). The plurality and the four justices concurring in the judgment agreed that a state cannot require a pregnant minor to obtain the consent of her parents to a first trimester abortion unless it establishes an alternative procedure by which she can attempt to demonstrate that she is capable of giving informed consent to the desired abortion "independently of her parents' wishes." *Bellotti II, supra* 99 S.Ct. at 3048 (plurality opinion); *see id.* at 3053–55 (Stephens, J., concurring in judgment). It is not permissible for a state to require parental consent for a first trimester abortion, therefore, except in those cases of minors unable to demonstrate that they are capable of themselves giving informed consent.[23]

Subsection (B) of Section 1870.05 does not comport with the rule established by *Danforth* and *Bellotti II*. It does not establish a procedure by which a minor can avoid a parental veto of her abortion decision by demonstrating that her decision is, in fact, informed. Rather, it requires, in all cases, both the minor's informed consent and either parental consent or a court order.[24] Subsection (B) places an impermissible right to veto the informed decision of a competent minor in her parents or, alternatively, in a court. It is, therefore, invalid.

b.

Subsection (A) of Section 1870.05 provides a parental notice requirement prior to

---

**23.** The Justices constituting the plurality in *Bellotti II* felt that even in the case of minors incapable of giving informed consent it was necessary for the state to afford a procedure by which it could be determined whether an abortion "would be in her best interests." *Bellotti II, supra* at 3048 (plurality opinion). This statement, however, was not necessary for decision of the question before the Court in *Bellotti II* nor any question presently before this Court.

**24.** The Court's reading of subsection (B) of Section 1870.05 is supported by the provision in subsection (B) of Section 1870.06: "In order to insure that the consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she, *and* one of her parents or legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter . . . .." (Emphasis added.)

performance of an abortion on any minor below the age of eighteen:

(A) No physician shall perform or induce an abortion upon an unmarried pregnant woman under the age of 18 years without first having given at least twenty-four (24) hours actual notice to one of the parents or the legal guardian of the minor pregnant woman as to the intention to perform such abortion, or if such parent or guardian cannot be reached after a reasonable effort to find him or her, without first having given at least seventy-two (72) hours constructive notice to one of the parents or the legal guardian of the minor pregnant woman by certified mail to the last known address of one of the parents or guardian, computed from the time of mailing unless the abortion is ordered by a court having jurisdiction over such minor pregnant woman.

▆▆▆ A parental notice requirement is not as much of an intrusion upon a minor's right of privacy as a requirement of parental consent. It is, however, a substantial intrusion, particularly for those minors mature and informed enough to grant valid consent to an abortion without parental consultation. Such consultation requirement furthers the state's interest in insuring that parents be given an opportunity to participate in an important and potentially traumatic decision in the life of their minor daughter. ⸢ But, those minors mature enough to make the decision to have an abortion independent of their parents' wishes must be afforded an opportunity to convince a court, or other body, that consultation would not be in their own, or in their parents', best interest. This Court recognizes that for the vast majority of minors parental consultation concerning such an important and irreversible decision is not only desirable, but essential. It also recognizes, however, that the vast majority of cases is not all cases. The problem with Subsection (A) of Section 1870.05 is that it, in effect, requires parental notice in all cases. (As conceded by defendant-intervenors, Chapter 2151 of the Ohio Revised Code, "provides for notice in all instances

once [a] *complaint has been filed . . ."* with a juvenile court in Ohio. Defendant-Intervenors' Reply To Plaintiffs' Supplementary Brief Concerning *Bellotti v. Baird* (emphasis in original). The apparent alternative provided by subsection (A) to parental notice, therefore, is not an actual alternative.) Accordingly, the Court finds subsection (A) of Section 1870.05 invalid.

The Court feels constrained to emphasize the narrowness of its decision. It is holding only that parental notice cannot be required for minors who are capable of granting informed consent without parental consultation and are able to convince a court or other body that notice would not be in their, or in their parents', best interest. *But see Bellotti II, supra* 99 S.Ct. at 3049 (plurality opinion).

2.

Plaintiffs next have standing to challenge Section 1870.06. The Court will consider the subsections of said section in seriatim.

a.

Subsection (A) of Section 1870.06 provides that an abortion cannot be performed without the informed written consent of the pregnant woman, "and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.-05(B) of this Chapter . . . ." Inasmuch as the Court has declared Section 1870.05 unconstitutional, the reference to it is a nullity and will be disregarded.

▆▆▆ The Supreme Court upheld a requirement of written informed consent to a first trimester abortion in *Danforth, supra* 428 U.S. at 65–67, 96 S.Ct. 2831. The Court's reasoning in that case applies to the present issue. Accordingly, the Court finds no constitutional defect in subsection (A) of Section 1870.06.

b.

▆▆▆ Subsection (B) of Section 1870.06 provides that, "[i]n order to insure that the consent for an abortion is truly informed consent . . . ," the attending physician

must inform every abortion patient of a number of specific things.[25] Those things range from a statement that the patient is pregnant to a detailed description of the "anatomical and physiological characteristics of the particular unborn child . . ." Also included is a statement that "the unborn child is a human life from the moment of conception . . . ."

In addition to challenging this subsection as an unjustified interference with the patient's right to privacy, the physician plaintiff asserts that the statement concerning human life is an interference with his free exercise of religion. Inasmuch as the Court has concluded that the subsection is unconstitutional as violative of a woman's right to privacy, it will not be necessary to consider the physician plaintiff's free exercise claim.

The Court in *Danforth, supra* at 67 n. 8, 96 S.Ct. at 2840 fn. 8, after approving a requirement of informed written consent to the performance of an abortion, included the following footnote:

> The appellants' vagueness argument centers on the word "informed." One might well wonder, offhand, just what "informed consent" of a patient is. The three Missouri federal judges who composed the three-judge District Court, however, were not concerned, and we are content to accept, as the meaning, the giving of information to the patient as to just what would be done and to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.

■ The stated desire to insure that a woman's consent to an abortion is truly informed is, of course, a valid state interest. Subsection (B), however, goes far beyond what is permissible in pursuance of that interest.

Initially, the defendants were unable to prove that some of the matters required to be told a patient as facts by subsection (B) were true. For example, there was much evidence that rather than being a "major surgical procedure" as the physician is required to state by part (5) of subsection (B), an abortion generally is considered a "minor surgical procedure." Further, there was much evidence that it is impossible to determine many of the items the physician is required to inform the patient by part (3) of subsection (B), such as the "unborn child's" sensitivity to pain.[26]

■ The Court has no doubt that the state could constitutionally require that all abortion patients be counselled, either by their attending physician or another individual having specified minimum qualifications.[27] The state cannot, however, go beyond that to specify what each patient must be told. That determination must be left to the individual counselor based upon the needs of the particular patient. Otherwise, the physician is being placed in the "undesired and uncomfortable straitjacket" warned against by the Supreme Court. This is not impermissible because of any perceived interference with rights of the physician. Rather, it is impermissible because it interferes with the woman's right to consult a physician who is free from such state interference.

Accordingly, the Court finds subsection (B) of Section 1870.06 unconstitutional.

## C.

■ Subsection (C) of Section 1870.-06 provides that the attending physician must inform each of his patients "of the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical

---

**25.** Again, inasmuch as Section 1870.05(B) has been declared unconstitutional, the reference to it will be disregarded.

**26.** There is also a vagueness problem with part (3) of subsection (B) because of the use of the

phrase "including, but not limited to . . . ." It is impossible for the physician to determine exactly what is required.

**27.** *See* text *infra* at 1204.

instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or carry her pregnancy to term." [28]

Initially, the fact that the state can require this type of information to be provided abortion patients is clear from the Supreme Court's approval of an informed consent requirement in *Danforth, supra* at 65–67 n. 8, 96 S.Ct. 2831. Subsection (C)'s requirement that this information be imparted by the attending physician rather than by a counselor, as is presently done at the clinics operated by the corporate plaintiffs, however, makes effectuation of the abortion decision more expensive. That impact is not so great as to require a compelling state interest to support the requirement that the "counseling" be done by the physician rather than by another individual. Akron's City Council could well have rationally concluded that because of the special relationship between a patient and her physician, such "counseling" should be done by the physician. In so doing, it would be furthering a valid state interest in the health of its female citizens. Subsection (C) of Section 1870.06, therefore, is not unconstitutional.

### d.

■ Subsection (D) of Section 1870.06 provides that the attending physician must provide his patient with a duplicate of the signed informed consent form. This requirement has no perceivable impact upon the woman's abortion decision and is not unconstitutional.

### 3.

■ Section 1870.07 imposes a twenty-four hour waiting period between the time a woman signs an informed consent form as required by Section 1870.06 and the performance of an abortion. The Court of Appeals for the Sixth Circuit refused to strike a similar waiting period requirement in *Wolfe v. Schroering,* 541 F.2d 523, 526 (6th Cir. 1976). The plaintiffs in that case, however, did not "claim that the 24 hour waiting period significantly burdens the abortion process." The plaintiffs in the present case do make such a claim and have submitted evidence in support of that claim.

The twenty-four hour waiting period serves to make effectuation of the abortion decision more expensive in two ways. First it requires the patient to make two trips to the clinic instead of one. Secondly, when considered along with the requirement of subsection (C) of Section 1870.06 that the physician do the counseling required, it makes the cost of the procedure itself more expensive.[29] This increase in expense, however, is not such that the waiting period requirement must withstand a compelling state interest test.[30]

The state interest furthered by the waiting period requirement is the insurance that a woman's abortion decision is made after careful consideration of all the facts applicable to her particular situation. This is an important state interest considering the irreversible nature and possible lasting consequences of the abortion decision.

■ The plaintiffs have argued, however, that the state's concern in this area is

---

**28.** References to sections previously found unconstitutional are nullities and, therefore, disregarded.

**29.** This increased expense can be minimized by arranging the days upon which procedures are performed to permit the physician to counsel women scheduled to have an abortion a day or so later on the same day as he performs abortions upon previously counseled women.

**30.** The Court does not accept plaintiffs' assertions that the waiting period may result in the passing from the first to the second trimester. "Given the imprecision of the trimesters . .

a delay of 24 hours could not result in a transition from the first into second trimester . . ." *Wolfe v. Schroering, supra* at 526. In addition, there was evidence that at least one of the clinics the day on which a particular woman's abortion is performed is, to an extent, determined by whether she desires a general as opposed to a local anaesthetic. If such delay does not result in a woman passing into the second trimester, it does not appear that a mandatory twenty-four hour waiting period will have that result.

satisfied by the fact that most women undergo counseling at a social agency prior to visiting an abortion clinic. Such agency, however, will not be able to counsel the woman with an eye to the particular medical facts concerning her individual pregnancy as will her attending physician. In addition, the fact that many or even most women undergo counseling prior to visiting an abortion clinic does not detract from the valid state interest in seeing that all women undergo counseling.

Having considered the impact of the twenty-four hour waiting period on a woman's abortion decision and the state's interest in such a waiting period, the Court finds Section 1870.07 constitutional.

### 4.

Section 1870.08 imposes certain recordkeeping requirements upon facilities in which abortions are performed. The impact of such requirement upon the woman's decision to terminate her pregnancy is minimal and it serves to further the state's valid interest in the health of the patient. Section 1870.08, therefore, is constitutional.

### 5.

Section 1870.09 provides that the medical records and physical facilities of all clinics and hospitals in which abortions are performed must be open for inspection by Akron's Department of Public Health and that such department must inspect all such locations at least once every six months. It also provides that all medical records shall remain confidential.

Plaintiffs do not attack this section as violative of any rights of their patients. Rather, the corporate plaintiffs contend that by authorizing warrantless searches of their clinics, Section 1870.09 is violative of their rights guaranteed by the Fourth Amendment.

Defendants' position is that the warrantless search authorized by this section is not unreasonable because any such search would be limited in scope and because plaintiffs are engaged in a "pervasively regulated business," *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), or "closely regulated" industry "long subject to close supervision and inspection." *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970). *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

The Court cannot agree. Initially, health care facilities do not have "a long tradition of close government supervision, of which any person who chooses to enter such a business must already by aware." *Barlow's, supra* at 313, 98 S.Ct. at 1821. Further, although defendants assert that any inspections of plaintiffs' clinics would be limited to an inspection of records and documents except for a sufficient inspection of facilities to insure satisfaction of Sections 1870.15 and 1870.16 of Ordinance Number 160–1978, such limitations do not appear on the face of Section 1870.09.

Accordingly, the Court finds that this section purports to authorize broad warrantless searches of plaintiffs' clinics. Such searches would be violative of plaintiffs' rights guaranteed by the Fourth Amendment. Section 1870.09, therefore, is unconstitutional.

### 6.

Section 1870.10 requires the attending physician to complete an individual abortion report for each woman upon whom he performs an abortion and an individual complication report for any post-abortion care provided. These reports are confidential and are to be completed on forms supplied by Akron's Department of Health.

The Supreme Court approved similar reporting requirements in *Danforth, supra* 428 U.S. at 79–81, 96 S.Ct. 2831. The Court cautioned, however, that "[r]ecordkeeping of this kind, *if not abused or overdone,* can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment." *Danforth, supra* at 81, 96 S.Ct. at 2846 (emphasis added). Plaintiffs contend that Section 1870.10 is unnecessary and redundant of requirements imposed upon them by the State of Ohio.

The fact that Ohio already requires plaintiffs to provide much of the same information required by Section 1870.10, however, makes this section's requirements less burdensome. Of course, if the information supplied to Ohio by plaintiffs was readily available to Akron, there would be no reason for this section and even though the impact upon an individual woman's abortion decision is slight, it would fail. There was, however, evidence that Akron has had difficulty obtaining the desired information from Ohio in a form that would enable them to make desired determinations concerning abortions performed in Akron. On balance, the Court finds Section 1870.10 constitutional.

### 7.

Section 1870.16 provides:

Any physician who shall perform or induce an abortion upon a pregnant woman shall insure that the remains of the unborn child are disposed of in a humane and sanitary manner.

Plaintiffs do not challenge this section as violative of the rights of their patients. Rather, the physician plaintiff challenges it as being so vague as to constitute a violation of his right to due process.

The Supreme Court considered a similar "vagueness" claim in *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954):

The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principal is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

The physician plaintiff contends that, because of its use of the term "humane," Section 1870.16 does not afford him "fair warning" of the standard to which his conduct must conform.

There is the possibility of some uncertainty regarding the intended meaning of most English words and phrases. *Robinson v. United States,* 324 U.S. 282, 286, 65 S.Ct.

666, 89 L.Ed. 944 (1945). Certain words, however, are of such a nature that they can evoke a totally different understanding in each individual listener. Among those words is the term "humane."

Humane means "marked by compassion, sympathy, or consideration for other human beings or animals." Webster's Third New International Dictionary 1100 (1965). An individual's sense of "compassion," "sympathy" and "consideration" is a product to a large extent, of his moral and religious training. As a result, a practice considered humane by one individual may well be considered inhumane by another.

The present section could, depending upon the sensitivities of the listener, be interpreted as meaning any number of things including the imposition of the "expensive burial" feared by plaintiffs in *Planned Parenthood Ass. v. Fitzpatrick,* 401 F.Supp. 554 (E.D.Pa.1975). The appropriate method for Akron's city council to have followed to insure that aborted fetuses are disposed of in a manner that they considered "humane," would have been to specifically state what methods of disposal were not or, alternatively, were acceptable. Accordingly, the Court finds Section 1870.16 void for vagueness.

### 8.

Section 1870.17 provides:

Any physician who shall perform or induce an abortion, shall, subsequent to that abortion being performed or induced, provide his patient with specific oral and written medical instructions to be followed by that patient in order to insure her safe recovery from the abortion.

This section has no significant impact upon a woman's right to effectuate her abortion decision and furthers the valid state interest in maternal health. Accordingly, Section 1870.17 is constitutional.

### 9.

Having determined that Sections 1870.06(A); 1870.06(C); 1870.06(D); 1870.-07; 1870.08; 1870.10; and 1870.17 are not unconstitutional when considered individu-

ally, the Court still must consider whether the combined impact of such sections upon a woman's privacy right to make and effectuate a decision to terminate her pregnancy free from state interference is such that they are invalid. There is no doubt that these regulations are going to have some impact upon a woman's abortion decision because they are going to make the effectuation of that decision more expensive. They will not make the cost of an abortion so much more expensive, however, that it will serve as a veto of plaintiffs' patients' abortion decision. These regulations do not, therefore, have to withstand a compelling state interest test. Further, the Court finds that the sections further valid state interests in maternal health and welfare and that the furtherance of those interests outweigh their effect on a woman's abortion decision.

Accordingly, the Court finds that Sections 1870.06(A); 1870.06(C); 1870.06(D); 1870.07; 1870.08; 1870.10; and 1870.17, when considered together, are not unconstitutional.

### VII

As noted previously, the Court's initial determination regarding severability must now be reviewed to determine whether the legislative body that adopted Ordinance Number 160–1978 would wish those parts of the ordinance not declared unconstitutional to remain without those parts found unconstitutional.[31]

As also noted, Section 1870.19 is evidence of a desire for severability, but it is not in itself determinative. Rather, it is necessary to look at the specific invalid sections and attempt to determine what the legislative body would desire.

■ The Court has found Section 1870.-05's notice and consent provisions unconstitutional. There are a number of references to Section 1870.05(B) in other sections of the ordinance. All of those references are

phrased in such a manner that subsection (B)'s invalidity does not interfere with the primary purpose of the sections containing them. The Court concludes, therefore, that Section 1870.05's invalidity does not affect other sections of the ordinance.

■ The Court also found Section 1870.-06(B) invalid. Although other sections, such as subsection (A) of Section 1870.06, are affected by that finding, the Court believes that the City Council would still desire the other sections to remain in the absence of Section 1870.06(B)'s very specific requirements. The Court concludes, therefore, that Section 1870.06(B)'s invalidity does not affect other sections of the ordinance.

■ The next section found unconstitutional was Section 1870.09. Inasmuch as the city can still carry out the purposes of that section by way of an inspection pursuant to a warrant, the Court concludes that its invalidity does not affect the rest of the ordinance.

■ The final part of Ordinance Number 160–1978 found unconstitutional was Section 1870.16. This section does not appear to be substantially related to the rest of the ordinance. Accordingly, the Court concludes that its invalidity does not affect other parts of the ordinance.

### VIII

■ Based upon the foregoing, the Court concludes that plaintiffs lack standing to challenge Sections 1870.02; 1870.03; 1870.04; 1870.11; 1870.12; 1870.13; 1870.-14; and 1870.15 of Ordinance Number 160–1978. The Court further concludes that Sections 1870.05; 1870.06(B); 1870.09; and 1870.16 of Ordinance Number 160–1978 are unconstitutional and enforcement of those provisions shall be permanently enjoined. Finally, the Court concludes that the remaining sections of Ordinance Number 160–1978 are constitutional.[32]

---

**31.** See note 6 supra.

**32.** Of course, any references to sections of the ordinance found unconstitutional contained in

sections not found unconstitutional are a nullity and must be disregarded.

Accordingly, the preliminary injunction previously entered in this action is hereby dissolved. Further, defendants are hereby permanently enjoined from enforcing Sections 1870.05; 1870.06(B); 1870.09; and 1870.16 of Ordinance Number 160–1978.

IT IS SO ORDERED.

## APPENDIX

ORDINANCE NO. 160–1978 amending and supplementing the Codified Ordinances of The City of Akron, Ohio, 1975, by the amendment of Chapter 1870, entitled "Regulation of Abortions".

WHEREAS, the citizens of Akron are entitled to the highest standard of health care; and

WHEREAS, abortion is a major surgical procedure which can result in complications, and adequate equipment and personnel should be required for its safe performance in order to insure the highest standards of care for the protection of the life and health of the pregnant woman; and

WHEREAS, abortion should be performed only in a hospital or in such other special outpatient facility offering the maximum safeguards to the life and health of the pregnant woman; and

WHEREAS, it is the finding of Council that there is no point in time between the union of sperm and egg, or at least the blastocyst stage and the birth of the infant at which point we can say the unborn child is not a human life, and that the changes occurring between implantation, a six-weeks embryo, a six-month fetus, and a one-week-old child, or a mature adult are merely stages of development and maturation; and

WHEREAS, traditionally the physician has been responsible for the welfare of both the pregnant woman and her unborn child, and that while situations of conflict may arise between a pregnant woman's health interests and the welfare of her unborn child, the resolution of such conflicts by inducing abortion in no way implies that the physician has an adversary relationship towards the unborn child; and

WHEREAS, Council therefore wishes to affirm that the destruction of the unborn child is not the primary purpose of abortion and that consequently Council recognizes a continuing obligation on the part of the physician towards the survival of a viable unborn child where this obligation can be discharged without additional hazard to the health of the pregnant woman; and

WHEREAS, Council, after extensive public hearings and investigations concludes that enactment of this ordinance is a reasonable and prudent action which will significantly contribute to the preservation of the public life, health, safety, morals, and welfare.

NOW, THEREFORE, BE IT ENACTED by the Council of The City of Akron:

*Section 1.* That the Codified Ordinances of the City of Akron, Ohio, 1975, are hereby amended and supplemented by the amendment of Chapter 1870, so as to read as follows:

## "CHAPTER 1870

### "1870.01 DEFINITIONS

"As used in this Chapter:

"(A) 'Abortion' means the purposeful termination of a human pregnancy after implantation of a fertilized ovum, by any person, including the pregnant woman herself, with an intention other than to necessarily produce a live birth or to remove a dead unborn child.

"(B) 'Hospital' means a general hospital or special hospital devoted to gynecology or obstetrics which is accredited by the Joint Commission on Accreditation of Hospitals or by the American Osteopathic Association.

"(C) 'Unborn child' means the unborn offspring of human beings from the moment of conception, through pregnancy and until live birth, including the human conceptus, zygote, morula, blastocyst, embryo, and fetus.

"(D) 'Viable' means potentially able to live outside of the womb of the mother upon premature birth whether resulting from natural causes of an abortion, or otherwise, and whether that potentiality exists in part due to the provision or availability of natural or artificial life-support systems.

"(E) 'Conception' means the fertilization of the ovum of a female individual by the sperm of a male individual.

"(F) 'Health' means physical or mental health.

"(G) 'Abortion facility' means a clinic, physician's office, or any other place or facility in which abortions are performed, other than a hospital.

"(H) 'Physician' means a person licensed to practice medicine in the State of Ohio.

"(I) 'Department of Public Health' means the Department of Public Health of the City of Akron.

## "1870.02 ABORTION BY LICENSED PHYSICIAN

"No person shall perform or induce an abortion upon a pregnant woman unless that person is a physician licensed to practice medicine in the State of Ohio and such abortion is performed in a hospital or an abortion facility.

## "1870.03 ABORTION IN HOSPITAL

"No person shall perform or induce an abortion upon a pregnant woman subsequent to the end of the first trimester of her pregnancy, unless such abortion is performed in a hospital.

## "1870.04 ABORTION AFTER VIABILITY

"(A) No physician shall perform or induce an abortion upon a pregnant woman after such time as her unborn child has become viable, unless such abortion is necessary to prevent the death of the pregnant woman or to prevent impairment to her health. Before a physician may perform or induce an abortion upon a pregnant woman after such time as her unborn child has become viable, such physician shall first certify in writing that the abortion is necessary to prevent the death of the pregnant woman or to prevent impairment to her health and shall further certify in writing the medical indications for such abortion and the probable health consequences if the abortion is not performed or induced.

"(B) An unborn child shall be presumed to be viable if more than twenty-four (24) weeks have elapsed from the probable beginning of the last menstrual period of the pregnant woman, based upon either information provided by her or through examination by her attending physician. If it is the judgment of the attending physician that the particular unborn child is not viable where the presumption of viability exists, then before such physician may perform or induce an abortion upon the pregnant woman he shall first certify in writing that the particular unborn child is not viable and shall further certify the precise medical findings upon which he bases that judgment.

"(C) Any physician who shall perform or induce an abortion upon a pregnant woman where the presumption of viability exists shall utilize the available method or technique of abortion most likely to preserve the life and health of the unborn child, unless that method or technique would present a significantly greater risk to the life or health of the pregnant woman than another available method or technique to be actually utilized, and the physician so certifies in writing.

"(D) An abortion of a viable unborn child shall be performed or induced only when there is in attendance a physician other than the physician performing or inducing the abortion who shall take control of and provide immediate medical care for a child born as a result of the abortion. During the performance or inducement of the abortion, the physician performing or inducing it, and subsequent to the abortion, the physician required by this section to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the unborn child.

"1870.05 NOTICE AND CONSENT

"(A) No physician shall perform or induce an abortion upon an unmarried pregnant woman under the age of 18 years without first having given at least twenty-four (24) hours actual notice to one of the parents or the legal guardian of the minor pregnant woman as to the intention to perform such abortion, or if such parent or guardian cannot be reached after a reasonable effort to find him or her, without first having given at least seventy-two (72) hours constructive notice to one of the parents or the legal guardian of the minor pregnant woman by certified mail to the last known address of one of the parents or guardian, computed from the time of mailing, unless the abortion is ordered by a court having jurisdiction over such minor pregnant woman.

"(B) No physician shall perform or induce an abortion upon a minor pregnant woman under the age of fifteen (15) years without first having obtained the informed written consent of the minor pregnant woman in accordance with Section 1870.06 of this Chapter and

"(1) First having obtained the informed written consent of one of her parents or her legal guardian in accordance with Section 1870.06 of this Chapter, or

"(2) The minor pregnant woman first having obtained an order from a court having jurisdiction over her that the abortion be performed or induced.

"1870.06 INFORMED CONSENT

"(A) An abortion otherwise permitted by law shall be performed or induced only with the informed written consent of the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, given freely and without coercion.

"(B) In order to insure that the consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she, and one of her parents or her legal guardian whose consent is required in accordance

with Section 1870.05(B) of this Chapter, have been orally informed by her attending physician of the following facts, and have signed a consent form acknowledging that she, and the parent or legal guardian where applicable, have been informed as follows:

"(1) That according to the best judgment of her attending physician she is pregnant.

"(2) The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or after a history and physical examination and appropriate laboratory tests.

"(3) That the unborn child is a human life from the moment of conception and that there has been described in detail the anatomical and physiological characteristics of the particular unborn child at the gestational point of development at which time the abortion is to be performed, including, but not limited to, appearance, mobility, tactile sensitivity, including pain, perception or response, brain and heart function, the presence of internal organs and the presence of external members.

"(4) That her unborn child may be viable, and thus capable of surviving outside of her womb, if more than twenty-two (22) weeks have elapsed from the time of conception, and that her attending physician has a legal obligation to take all reasonable steps to preserve the life and health of her viable unborn child during the abortion.

"(5) That abortion is a major surgical procedure, which can result in serious complications, including hemorrhage, perforated uterus, infection, menstrual disturbances, sterility and miscarriage and prematurity in subsequent pregnancies; and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances.

"(6) That numerous public and private agencies and services are available to pro-

vide her with birth control information, and that her physician will provide her with a list of such agencies and the services available if she so requests.

"(7) That numerous public and private agencies and services are available to assist her during pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place him or her for adoption, and that her physician will provide her with a list of such agencies and the services available if she so requests.

"(C) At the same time the attending physician provides the information required by paragraph (B) of this Section, he shall, at least orally, inform the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, of the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or carry her pregnancy to term.

"(D) The attending physician performing or inducing the abortion shall provide the pregnant woman, or one of her parents or legal guardian signing the consent form where applicable, with a duplicate copy of the consent form signed by her, and one of her parents or her legal guardian where applicable, in accordance with Paragraph (B) of this Section.

## "1870.07 WAITING PERIOD

"No physician shall perform or induce an abortion upon a pregnant woman until twenty-four (24) hours have elapsed from the time the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, have signed the consent form required by Section 1870.06 of this Chapter, and the physician so certifies in writing that such time has elapsed.

## "1870.08 RECORDS

"All abortion facilities and hospitals in which abortions are performed or induced shall keep records, including admission and discharge notes, histories, results of tests and examinations, nurses work sheets, social service records, and progress notes, and shall further keep a copy of all written certifications provided for in this Chapter as well as a copy of records of constructive work consent forms, abortion reports, and complication reports provided for in Sections 1870.05, 1870.06 and 1870.10 of this Chapter. Such records shall be maintained in the permanent files of the hospital or abortion facility for a period of not less than seven (7) years.

## "1870.09 INSPECTION

"(A) The medical records and the physical facilities of all abortion facilities and hospitals in which abortions are performed shall be open to inspection at any time by the Department of Public Health for purposes of gathering statistical data and insuring compliance with the provisions of this Chapter.

"(B) The medical records of abortion facilities and hospitals in which abortions are performed and all information contained therein shall remain confidential and shall be used by the Department of Public Health only for the purposes set forth in Paragraph (A) of this Section.

"(C) The Department of Public Health shall physically inspect all abortion facilities at least once every six (6) months to insure compliance with this Chapter and all laws, ordinances, rules and regulations of the State of Ohio and City of Akron concerning health and sanitation.

## "1870.10 REPORTING

"(A) An individual abortion report for each abortion performed or induced upon a woman shall be completed by her attending physician. The report shall be confidential

and shall not contain the name of the woman. This report shall include:

"(1) Patient number.

"(2) Name and address of the abortion facility or hospital.

"(3) Date of abortion.

"(4) Zip code of residence of pregnant woman.

"(5) Age of pregnant woman.

"(6) Race.

"(7) Marital status.

"(8) Number of previous pregnancies.

"(9) Years of education.

"(10) Number of living children.

"(11) Number of previous induced abortions.

"(12) Date of last induced abortion.

"(13) Date of last live birth.

"(14) Method of contraception at time of conception.

"(15) Date of beginning of last menstrual period.

"(16) Medical condition of woman at time of abortion.

"(17) RH type of pregnant woman.

"(18) Type of abortion procedure.

"(19) Complications by type.

"(20) Type of procedure done after the abortion.

"(21) Type of family planning recommended.

"(22) Type of additional counselling given.

"(23) Signature of attending physician.

"(24) The certifications provided for in this Chapter.

"(B) An individual complication report for any post-abortion care performed upon a woman shall be completed by the physician providing such post-abortion care. This report shall include:

"(1) The date of the abortion.

"(2) The name and address of the abortion facility or hospital where the abortion was performed.

"(3) The nature of the abortion complication diagnosed or treated.

"(C) All abortion reports shall be signed by the attending physician and submitted to the Department of Public Health within 30 days from the date of the abortion. All complication reports shall be signed by the physician providing the post-abortion care and submitted to the Department of Public Health within 30 days from the date of the post-abortion care.

"(D) A copy of the abortion report shall be made a part of the medical record of the patient of the facility or hospital in which the abortion was performed.

"(E) The Department of Public Health shall be responsible for collecting all abortion reports and complication reports and collating and evaluating all data gathered therefrom, and shall annually publish a statistical report based on such data from abortions performed in the previous calendar year.

"1870.11 FORMS

"(A) The Department of Public Health shall make available to physicians performing abortions in the City of Akron constructive notice forms, consent forms, abortion report forms and complication report forms as provided for in Sections 1870.05, 1870.06 and 1870.10 of this Chapter.

"(B) The Department of Public Health shall make available to all physicians, who may perform post-abortion care, complication report forms as provided for in Section 1870.10 of this Chapter.

"(C) The Department of Public Health shall prepare and make available to all physicians performing abortions in the City of Akron, a current list of all public and private agencies and services available for use in accordance with Sections 1870.06(B)(11) and 1870.06(B)(12) of this Chapter.

"1870.12 EMERGENCY

"The following provisions of this Chapter shall not apply where there is an emergency need for an abortion to be performed or induced such that continuation of the pregnancy poses an immediate threat and grave risk to the life or physical health of the

pregnant woman, and the attending physician so certifies in writing:

"(A) Section 1870.05.

"(B) Section 1870.06(B) with respect to the signature of one of the parents or the legal guardian of the pregnant woman where applicable.

"(C) Section 1870.07.

"(D) Section 1870.13.

"(E) Section 1870.14(B) with respect to aftercare of an abortion patient.

## "1870.13 MUNICIPAL HOSPITALS

"No hospital or other health facility owned or operated by the City of Akron shall permit its premises, facilities, or equipment to be used for the purpose of performing or inducing an abortion upon a pregnant woman.

## "1870.14 FREEDOM OF CONSCIENCE

"(A) No private hospital, hospital director, or governing board of a private hospital, within the City of Akron, is required to permit abortions to be performed in such hospital." Refusal to permit an abortion is not a basis for disciplinary or other recriminatory action.

"(B) No person may be required to perform or participate in medical procedures which result in an abortion, which are in preparation for an abortion, or which involves aftercare of an abortion patient, and refusal to perform or participate in such medical procedures is not a basis for disciplinary or other recriminatory action.

## "1870.15 EXPERIMENTATION

"No person shall experiment upon or sell a live child or unborn child unless such experimentation is therapeutic to the child or unborn child.

## "1870.16 DISPOSAL OF REMAINS

"Any physician who shall perform or induce an abortion upon a pregnant woman shall insure that the remains of the unborn child are disposed of in a humane and sanitary manner.

## "1870.17 INSTRUCTIONS TO BE PROVIDED SUBSEQUENT TO ABORTION

"Any physician who shall perform or induce an abortion, shall, subsequent to that abortion being performed or induced, provide his patient with specific oral and written medical instructions to be followed by that patient in order to insure her safe recovery from the abortion.

## "1870.18 PENALTY

"(A) Whoever violates Sections 1870.02, 1870.03, 1870.04, 1870.05, 1870.06, 1870.07, 1870.08, 1870.10, 1870.14, 1870.15 or 1870.17 of this Chapter shall be deemed guilty of a misdemeanor of the first degree and punished as provided for in Section 698.02 of the Codified Ordinances of the City of Akron, Ohio, 1975.

"(B) Whoever violates any other provision of this Chapter shall be deemed guilty of a misdemeanor of the third degree and punished as provided for in Section 698.02 of the Codified Ordinances of the City of Akron, Ohio, 1975.

## "1870.19 SEVERABILITY

"Should any provision of this Chapter be construed by any court of law to be invalid, illegal, unconstitutional, or otherwise unenforcible, such invalidity, illegality, unconstitutionality, or unenforcibility shall not extend to any other provision or provisions of this Chapter."

*Section 2.* That the existing Sections 1870.01, 1870.02, and 1870.03 of the Codified Ordinances of the City of Akron, Ohio, 1975, enacted by Ordinance No. 993–1976, be and hereby are repealed.

*Section 3.* That this ordinance shall take effect and be in force May 1, 1978.

## ORDER

### ON MOTION FOR NEW TRIAL

The above captioned matter is before the Court upon plaintiffs' "Motion For A New Trial Or In The Alternative To Alter Or

Amend The Judgment." Upon consideration and for the reasons stated below, plaintiffs motion shall be granted in part and denied in part.

Plaintiffs instituted this action challenging Ordinance Number 160–1978, "amending and supplementing the Codified Ordinances of the City of Akron, Ohio, 1975, by the amendment of Chapter 1870, entitled 'Regulation of Abortions,'" on April 19, 1978. The Court duly heard testimony and received exhibits addressed to the constitutionality of the various sections of Ordinance Number 160–1978. By its Memorandum Opinion and Order of August 22, 1979, the Court found certain sections of the challenged ordinance constitutional; found certain other sections unconstitutional; and determined that plaintiffs lacked standing to challenge the remaining sections. By the instant motion, plaintiffs seek reconsideration of that part of the Court's opinion finding that they lacked standing to challenge Section 1870.03 of Akron Ordinance 160–1978.

The defendant-intervenors have opposed the plaintiffs' motion for a new trial arguing that it should be denied because of the plaintiffs' failure to comply with Rule 59(b). Rule 59(b) states that a motion for a new trial shall be served not later than ten days after the entry of judgment. Defendant-intervenors recognize that plaintiffs' motion was timely filed, but say that because they were not served with the motion within the ten day time period the motion must be denied.

While it would have been preferable for the plaintiffs to give service to all groups involved, the plaintiffs' failure to send notice to defendant-intervenors was apparently due to their understanding that the interests of minors, represented by the defendant-intervenors, were not implicated by the substantive arguments raised in the motion. To the extent that a motion under Rule 59 affects the time for appeal for all persons involved, notice should be sent to all persons who have appeared. See Rule 4(a)(4), Federal Rules of Appellate Procedure. The crucial aspect of Rule 59 is the ten day period. 6A Moore's Federal Practice ¶ 59.09. Construing Rule 59 in light of Rule 1, Federal Rules of Civil Procedure, the Court determines that plaintiffs' motion for a new trial is proper and the Court will consider the merits of the issues raised.

Section 1870.03 is as follows:

No person shall perform or induce an abortion upon a pregnant woman subsequent to the end of the first trimester of her pregnancy, unless such abortion is performed in a hospital.

Plaintiffs did not brief their standing to attack this section of Akron's ordinance prior to the Court's issuance of its opinion. Further, there was evidence that none of the plaintiffs engaged in performance of abortions subsequent to the end of the first trimester. The coordinator of the Akron Women's Clinic, however, did express a desire to engage in performance of abortions during the early part of the second trimester. When questioned at trial as to why her clinic did not provide such abortions, she testified that Akron already had an ordinance that prevented provision of such abortions in a clinic setting. Based upon that testimony, the Court concluded:

If Section 1870.03 were declared unconstitutional . . . such abortions could still not be performed in a clinic because of a preexisting Akron ordinance that is not here under attack. Plaintiffs, therefore, lack standing to challenge Section 1870.03.

Plaintiffs have now, by their brief in support of the instant motion, addressed their standing to challenge Section 1870.03. Apparently, the preexisting ordinance to which the coordinator of Akron Women's Clinic made reference was also numbered 1870.03 and was in all respects identical to the section here under consideration. Further, Section 2 of Ordinance Number 160–1978 provided:

That the existing Sections 1870.01, 1870.-02, and 1870.03 of the Codified Ordinances of the City of Akron, Ohio, 1975, enacted by Ordinance No. 993–1976, be and hereby are repealed.

Accordingly, based upon the facts plaintiffs have now brought to the Court's attention, that part of its Memorandum Opinion and Order of August 22nd finding plaintiff Akron Women's Clinic without standing to challenge Section 1870.03 of Ordinance Number 160–1978 shall be vacated. Reaching the merits of the plaintiffs' constitutional challenge, the Court finds Section 1870.03 constitutional and plaintiffs' request for declaratory and injunctive relief in regard to it shall be denied.

In *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that the Fourteenth Amendment's protection of certain aspects of personal privacy included a guarantee that a woman could decide whether to terminate her pregnancy without unjustified state interference. Inasmuch as the woman's right to make an unencumbered decision concerning abortion was found in the "fundamental right" of privacy, the Court stated that interference with that right could be justified only by a "compelling state interest." *Roe, supra* at 155, 93 S.Ct. 705. The Court further recognized that the state had a valid interest in maternal health and the protection of potential human life. The state's interest in potential human life was found to become "compelling" at viability. The state's interest in protecting maternal health, "in the light of present medical knowledge," was found to become "compelling" at approximately the end of the first trimester. *Roe, supra* at 163, 93 S.Ct. at 731. Section 1870.03 was passed in furtherance of this asserted compelling state interest in protecting maternal health from the close of the first trimester of pregnancy.

Plaintiffs' attack Section 1870.03 saying that although abortions beyond the end of the first trimester of pregnancy were safer in a hospital setting at the time of the *Roe* decision, that is no longer true. Plaintiffs presented evidence in the form of testimony and exhibits to support a finding that early second trimester clinical abortions are now just as safe as early second trimester hospital abortions. The Court, however, does not find plaintiffs' evidence on this issue so convincing that it is willing to discard the Supreme Court's formulation in *Roe*. Accordingly, the Court finds that Section 1870.03 furthers the compelling state interest in protection of maternal health and is, therefore, constitutional.

Based upon the foregoing, plaintiffs' "Motion For A New Trial Or In The Alternative To Alter Or Amend Judgment," is hereby granted in part and denied in part. That part of the Court's Memorandum Opinion and Order finding Akron Women's Clinic without standing to challenge Section 1870.03 of Ordinance 160–1978 is hereby vacated. Further, Section 1870.03 is hereby found to be constitutional and plaintiffs' request for declaratory and injunctive relief is hereby denied.

IT IS SO ORDERED.